**ALBERTO–CULVER COMPANY, a Delaware corporation, Plaintiff-Appellee,**

v.

**Fritz SCHERK, Defendant-Appellant.**

**No. 72–1158.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1973.

Decided Aug. 2, 1973.

Rehearing Denied Oct. 18, 1973.

---

Robert F. Hanley, Lynne E. McNown, Chicago, Ill., for defendant-appellant.

Francis J. Higgins, A. Charles Lawrence, Chicago, Ill., for plaintiff-appellee.

Before STEVENS, Circuit Judge, GRANT, Senior District Judge,* and GORDON, District Judge.** .

MYRON L. GORDON, District Judge.

This is an interlocutory appeal. The district court found that it had jurisdiction over both the parties and the subject matter of this lawsuit. Also, the district court refused to stay the proceedings before it while the parties arbitrated their dispute before the International Chamber of Commerce tribunal in Paris, France. The court enjoined the parties from such arbitration.

The appellee urges that the findings and order of the district court are not appealable under 28 U.S.C. § 1292(a)(1) and has moved for dismissal of the appeal. ·For the reasons set forth in this opinion, we find that this court may properly entertain the appeal, and we affirm the decision of the district court.

The plaintiff-appellee, Alberto-Culver (Alberto) is a Delaware corporation with its principal offices situated in Illinois. It manufactures and distributes toiletries and hair products in national and international markets.

---

* Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

** District Judge Myron L. Gordon of the Eastern District of Wisconsin is sitting by designation.

The defendant-appellant, Fritz Scherk (Scherk) is a German citizen who presently resides in Switzerland. Prior to the transactions here in issue, Scherk was engaged in the manufacture and sale of cosmetic products for sale in western Europe. The principle manufacturing operations were conducted by Scherk in facilities situated within Berlin, Germany, and owned by Scherk through a sole proprietorship called Firma Ludwig Scherk (FLS).

Scherk also owned interrelated business entities known as Scherk Establissement Vaduz (SEV), a Lichtenstein entity which has no counterpart in the United States, and Lodeva Herstellung und Vertrieb Kosmetischer Artikel GMBH (Lodeva), a German entity which has no counterpart in the United States. SEV was operated by Scherk as a holding company licensing the sale and distribution of Scherk's cosmetics on an international basis under a variety of trademarks. The Lodeva entity was dormant and remains so.

In June, 1967, Alberto contacted Scherk in Germany to explore the possibility that Scherk might sell his European cosmetic business. In November, 1967, Fred Maeding of Alberto visited Scherk in Germany to pursue negotiations for such acquisition. In December, 1967, Alberto's president, Leonard H. Lavin, met with Scherk's representative, Benjamin Navon, in Chicago, Illinois. The negotiations were terminated.

In February, 1968, Alberto contacted Scherk in Berlin and negotiations were resumed. An agreement in principle was reached at this time concerning the basic terms for Alberto's acquisition of Scherk's business entities, SEV, FLS, and Lodeva; the details of the agreement were hammered out in Melrose Park, Illinois, during a 3-day meeting held in late May and early June, 1968. Scherk was present in Illinois for this latter meeting. A written document was ultimately prepared and signed in Vienna, Austria, by Scherk in February, 1969.

Among other things, the agreement between Alberto and Scherk provided that SEV was to be converted to a stock corporation and that Alberto was to acquire 100% of the stock of the new corporation. Accordingly, the parties entered into an escrow agreement by which Scherk assigned all of his rights in SEV to the escrow agent who was to accomplish the conversion and hold the certificates until closing.

The agreement also provided that as to the acquisition of SEV that:

"The parties agree that if any controversy or claim shall arise out of this agreement or the breach thereof and either party shall request that the matter shall be settled by arbitration, the matter shall be settled exclusively by arbitration in accordance with the rules then obtaining of the International Chamber of Commerce, Paris, France, by a single arbitrator, if the parties shall agree upon one, or by one arbitrator appointed by each party and a third arbitrator appointed by the other arbitrators. In case of any failure of a party to make an appointment referred to above within four weeks after notice of the controversy, such appointment shall be made by said Chamber. All arbitration proceedings shall be held in Paris, France, and each party agrees to comply in all respects with any award made in any such proceeding and to the entry of a judgment in any jurisdiction upon any award rendered in such proceeding. The law of the State of Illinois, U.S.A. shall apply to and govern this agreement, its interpretation and performance."

The agreement provided that as to the acquisition of FLS that:

"The parties agree that if any controversy or claim shall arise out of this agreement or the breach thereof, the matter shall be settled exclusively by arbitration in accordance with the rules then obtaining of the International Chamber of Commerce, Paris, France, by a single arbitrator, if the

parties shall agree upon one, or by one arbitrator appointed by each party and a third arbitrator appointed by the other arbitrators. In case of any failure of a party to make an appointment referred to above within four (4) weeks after notice of the controversy, such appointment shall be made by said Chamber. Unless otherwise agreed, all arbitration proceedings shall be held in Paris, France, and each party agrees to comply in all respects with any award made in any such proceeding and to the entry of a judgment in any jurisdiction upon any award rendered in such proceeding. The laws of the State of Illinois, U.S.A. shall apply to and govern this agreement, its interpretation and performance."

The closing of the transaction was accomplished in Geneva, Switzerland, in June, 1969. Nearly one year later, Alberto discovered that the trademark rights purchased from Scherk were subject to substantial encumbrances. A dispute arose, and Alberto attempted to rescind the purchase agreement; it tendered the business to Scherk, who refused to accept the tender.

Scherk first took steps to institute arbitration in early 1971; however, a request for arbitration was not filed with the International Chamber of Commerce until November 9, 1971. Alberto commenced the instant action in the district court for the northern district of Illinois on June 11, 1971, alleging that it was defrauded in the acquisition of these businesses in violation of Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.

As pertinent here, 28 U.S.C. § 1292(a) provides:

"The courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions. . . ."

■ The appellee contends that the district court's order preliminarily enjoining Scherk from proceeding with arbitration in Paris and denying a stay of its own proceedings is not an interlocutory injunction within the meaning of 28 U.S.C. § 1292(a)(1). We disagree.

The practical result of the district court's order is to terminate Scherk's recourse to arbitration of the dispute before the International Chamber of Commerce in Paris and as such, the order qualifies as an "injunction" within the meaning of 28 U.S.C. § 1292(a)(1). Ettelson v. Metropolitan Life Insurance Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942); Shanferoke Co. v. Westchester Co., 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 647 (1935); Merritt-Chapman & Scott Corp. v. Pennsylvania Turn. Com'n, 387 F.2d 768 (3d Cir. 1967); Cuneo Press v. Kokomo Jamdler's Union No. 34, 235 F.2d 108 (7th Cir. 1956). Accordingly, the motion to dismiss the appeal may not be granted.

The district court based its refusal to stay the proceedings and granted an injunction to bar the parties from proceeding with arbitration before the Paris tribunal on the authority of Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). That case held that section 14 of the Securities Act of 1933, 15 U.S.C. § 77a et seq., voided agreements made in connection with the purchase of securities to arbitrate disputes which may arise in the future; the aggrieved party has a nonwaivable right to have his dispute determined in a judicial forum. In resolving the conflict between the United States Arbitration Act and the Securities Act of 1933, the Court stated at page 438, 74 S.Ct. at page 188:

"Two policies, not easily reconcilable, are involved in this case. Congress has afforded participants in transactions subject to its legislative power an opportunity generally to secure prompt, economical and adequate solution of controversies through arbitration if the parties are willing to ac-

cept less certainty of legally correct adjustment. On the other hand, it has enacted the Securities Act to protect the rights of investors and has forbidden a waiver of any of those rights. Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controversies, we decide that the intention of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the Act."

The appellant seeks to limit the rule of Wilko v. Swan to domestic transactions and asserts that the correct rule for international transactions is found in M. S. Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed. 2d 513 (1972). However, the *Bremen* case did not involve the sale of securities and is, therefore, not controlling.

██ ██ We agree with the district court that the appellant had sufficient contacts within the United States to give the court personal jurisdiction over the appellant. See McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The question of the district court's jurisdiction turns on whether the transaction here in issue involves "securities" within the purview of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. We conclude that it does.

Section 3(a)(10) of the Securities Exchange Act of 1934 provides:

"(10) The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, ·draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

The United States Supreme Court determined in Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) that this language is to be construed broadly to effect the purposes of the act, one of which is "to protect investors through the requirement of full disclosure by issuers of securities". At page 338, 88 S.Ct. at page 554, the Court stated:

"As used in the 1933 [Securities Act] and 1934 [Securities Exchange Act] Acts, security 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet countless and variable schemes devised by those who seek the use of money of others on the promise of profits.' "

This mandate to construe broadly the term "security" compels our conclusion that the agreement to incorporate the SEV entity, and to transfer the assets of the SEV, FLS and Lodeva entities in exchange for cash and promissory notes involves a "security" within the meaning of the Securities Exchange Act of 1934. Movielab, Inc. v. Berkey Photo, Inc., 452 F.2d 662 (2d Cir. 1971); Lawrence v. Securities and Exchange Comm., 398 F. 2d 276 (1st Cir. 1968).

We find that the district court did not abuse its discretion in refusing to stay the proceedings before it, pending arbitration. The order appealed from is

Affirmed.

STEVENS, Circuit Judge (dissenting).

In the two decades since the Supreme Court considered the collision between

the two conflicting policies which made Wilko v. Swan such a close case,[1] there have been several important developments which significantly affect the wisdom of applying the rule of that case to a transaction such as this. On the other hand, the relevant statutory language has not changed materially and it is not easy to identify a principled basis for distinguishing that case from this. Nevertheless, since I am persuaded that Congress did not intend the Exchange Act of 1934 to hamper the ability of American firms to acquire foreign businesses, I believe this arbitration clause should be enforced.

Since 1953 the policy of encouraging the settlement of disputes by arbitration has received increasingly strong endorsement, see, e. g., Metro Industrial Painting Corp. v. Terminal Construction Co., 287 F.2d 382, 385 (2d Cir. 1961); Prima Paint v. Flood & Conklin, 388 U. S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270; Halcon International, Inc. v. Monsanto Australia Ltd., 446 F.2d 156 (7th Cir. 1971), cert. denied, 404 U.S. 949, 92 S.Ct. 286, 30 L.Ed.2d 266.[2] During this period overseas commercial activities of American business enterprises have expanded dramatically, adding emphasis to the value of arbitration as a method of adjusting international business disputes.

"For at least two decades we have witnessed an expansion of overseas commercial activities by business enterprises based in the United States. The barrier of distance that once tended to confine a business concern to a modest territory no longer does so. Here we see an American company with special expertise contracting with a foreign company to tow a complex machine thousands of miles across seas and oceans. The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. Absent a contract forum, the considerations relied on by the Court of Appeals would be persuasive reasons for holding an American forum convenient in the traditional sense, but in an era of expanding world trade and commerce, the absolute aspects of the doctrine of the *Carbon Black* case have little place and would be a heavy hand indeed on the future development of international commercial dealings by Americans. We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts." M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 8–9, 92 S.Ct. 1907, 1912, 32 L.Ed.2d 513.[3]

An excessively paternalistic attitude toward American overseas investment will inevitably make American capital less attractive to foreign firms.

At the same time, the coverage of the Exchange Act of 1934 has been growing at a pace which makes it operative in situations quite unlike those in which the Securities Act of 1933 typically applies. The holding in Wilko v. Swan

---

1. The district court was reversed by a divided court of appeals, Wilko v. Swan, 201 F.2d 439 (2d Cir. 1953), which was in turn reversed by a divided Supreme Court. See dissenting opinion of Mr. Justice Frankfurter, 346 U.S. at 439, 74 S.Ct. 182 and concurring opinion of Mr. Justice Jackson, id. at 438, 74 S.Ct. 182.

2. Judicial support for arbitration was slow to manifest itself. In an interesting footnote to his opinion in Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978 (2d Cir. 1942), Judge Frank reviewed early examples of legislative approval of arbitration to support his comment: "In the light of the clear intention of Congress, it is our obligation to shake off the old judicial hostility to arbitration." Id. at 985. See id. at 985 n. 24a.

3. As Judge Gordon points out, the *Zapata* case did not involve the sale of securities and therefore is not controlling here. Moreover, the Chief Justice expressly limited his opinion to international agreements "unaffected by fraud," 407 U.S. at 12, 92 S.Ct. 1907. Nevertheless, I believe the policy considerations which underlie that decision are relevant here.

rested, in part, on the fact that the 1933 Act was intended to give special protection to the relatively uninformed, individual investor.

"While a buyer and seller of securities, under some circumstances, may deal at arm's length on equal terms, it is clear that the Securities Act was drafted with an eye to the disadvantages under which buyers labor. Issuers of and dealers in securities have better opportunities to investigate and appraise the prospective earnings and business plans affecting securities than buyers. It is therefore reasonable for Congress to put buyers of securities covered by that Act on a different basis from other purchasers.

"When the security buyer, prior to any violation of the Securities Act, waives his right to sue in courts, he gives up more than would a participant in other business transactions. The security buyer has a wider choice of courts and venue. He thus surrenders one of the advantages the Act gives him and surrenders it at a time when he is less able to judge the weight of the handicap the Securities Act places upon his adversary." 346 U.S. 427, 435, 74 S.Ct. 182, 98 L.Ed. 168.[4]

The Exchange Act of 1934 also provides essential protections for the individual investor trading in the impersonal securities market. Insofar as that Act proscribes insider trading, "sales against the box" by controlling persons, manipulative and deceptive practices in connection with purchases and sales over a stock exchange, and similar aspects of transactions between the average investor and a relatively more sophisticated broker, dealer, or insider, quite obviously the rationale of Wilko v. Swan would preclude the enforceability of an agreement to waive a judicial remedy under the Act. For in such situations the same kind of disparity in either information or bargaining power is likely to be present, and there is no more reason to favor arbitration than in disputes arising under the 1933 Act.

But with the application of Rule 10(b)(5) to negotiated transactions in which the amount at stake typically justifies an independent audit or other verification of the property being purchased or sold, and the transfer of securities is a function of the form in which the parties elect to cast their transaction, quite different considerations apply. To the extent that reliance on statutory protection plays a relatively less significant part in the investment decision, there is a correspondingly lesser justification for a prohibition against any waiver of the benefits of the Act. Moreover, in transactions which are sufficiently large and complex that the parties typically contemplate the possibility of future controversy, the method of resolving foreseeable disputes is itself a proper subject of bargaining. In the international market, the inability to agree on a neutral forum quite clearly may have an impact on the price of the transaction, or even the acceptability of a prospective purchaser. The reason for the rule of Wilko v. Swan simply does not fit this case.

---

4. The brief for the Securities and Exchange Commission, Amicus Curiae, emphasized the statutory concern for the disadvantaged position of the average investor.

"Congress conceived that securities are 'intricate merchandise', and that the public interest demanded legislation which would recognize the gross inequality of bargaining power between the professionals in the securities business and the average investor." Amicus Brief, p. 15.

"The Securities Act of 1933 . . . was designed primarily to protect the less informed members of the public against the professionals, in the light of past experience which indicated that misrepresentations not infrequently were made and that under pre-existing law it was extremely difficult for the customer to obtain adequate redress." *Id.* at 33.

"Contrary to the purpose of Congress, the decision below gives no recognition to the grossly unequal positions of the securities firm and the average customer who, before effecting a purchase, is requested to sign a fine-print form agreement." *Id.* at 45–46.

In view of the substantial identity between the language of § 14 of the 1933 Act,[5] and § 29(a) of the 1934 Act,[6] it is not easy to give the two provisions different interpretations. Nevertheless, since even *Wilko v. Swan* approves a measure of license in reading § 14,[7] and since even the same words in different parts of the same statute may be read differently,[8] I am persuaded that § 29(a) may be read to permit enforceability of certain agreements to arbitrate disputes which involve a claimed violation of the 1934 Act.

Section 29(a) prohibits the plaintiff from waiving the defendant's compliance with any "provision" of the Act. For present purposes, the relevant "provision" of the 1934 Act is § 27 which au-

thorizes the plaintiff to bring a civil action in the federal district court.[9] There is no language in the Act obligating the defendant to act in "compliance with" § 27. What is waived—if the arbitration agreement is enforced—is plaintiff's right to sue rather than defendant's obligation to comply with the Act. Thus, enforcement of the arbitration agreement is consistent with a literal reading of the text of §§ 27 and 29(a).

It is not, however, entirely consistent with the reading given § 14 of the 1933 Act by the Supreme Court in *Wilko v. Swan.* But that reading depended less on the text of the statute than on its underlying policy.[10] The text of the 1933

5. "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this title or of the rules and regulations of the Commission shall be void." 48 Stat. 84, 15 U.S.C. § 77n.

6. "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void." 48 Stat. 903, 15 U.S.C. § 78cc(a).

7. The text of § 14 does not support the limitation of the holding to stipulations made before any controversy arose. Moreover, the language prohibiting waiver of "compliance with any provision of this title" could easily have been read to relate to substantive provisions of the Act without including the remedy provisions.

8. See, *e. g.*, Puerto Rico v. Shell Co., 302 U.S. 253, 258–259, 58 S.Ct. 167, 82 L.Ed. 235; Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87–88, 55 S.Ct. 50, 79 L.Ed. 211; Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204; Grand Lodge v. King, 335 F.2d 340, 344–345 (9th Cir. 1964).

9. Section 27 provides:
"Sec. 27. The district courts of the United States, the Supreme Court of the District of Columbia, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. Judgments and decrees so rendered shall be subject to review as provided in sections 128 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 225 and 347). No costs shall be assessed for or against the Commission in any proceeding under this title brought by or against it in the Supreme Court or such other courts." 48 Stat. 902–903, 15 U.S.C. § 78aa.

10. In the court of appeals the issue in *Wilko v. Swan* was stated as "whether the 1933 Act evidences a public policy which forbids referring the controversy to arbitration." 201 F.2d at 443. That court accurately pointed out that the question was not expressly answered by the statutory language: "Although the question is not free from doubt and Judge

Act, like the text of the 1934 Act, renders void any waiver by a plaintiff of defendant's obligation to comply with the statute. Neither text expressly applies to the plaintiff's waiver of his right to sue in a federal court. Moreover, the rule of Wilko v. Swan does not entirely prohibit the plaintiff's waiver of that right; the case merely decided *when* plaintiff may not waive a right— namely, before the dispute under the 1933 Act has arisen.[11] Thus, I do not read Wilko v. Swan as a case giving fixed meaning to ambiguous statutory language. Rather, I believe it is more fairly construed as a case holding that in certain situations the enforceability of arbitration agreements should be denied as contrary to the public policy expressed in the statute as a whole, and extending the literal coverage of § 14 of the Act to achieve that purpose.[12] The same rationale justifies an expansion of the coverage of § 29(a) of the 1934 Act beyond its literal meaning to find unenforceability of arbitration agreements which would defeat the purposes of that Act.[13] But in a case such as this, and no doubt in less extreme cases as well, I would interpret § 29(a) as meaning no more than it actually says, and respect what I regard as the stronger policy mandated by § 201 of the Federal Arbitration Act, 9 U.S.C. § 201.

The dispute between these parties over the alleged shortage in defendant's inventory of European trademarks, a matter covered by contract warranties and subject to pre-closing verification, is the kind of commercial dispute for

---

Goddard's opinion presents a strong argument against the conclusion we have reached, we do not find in the purpose or in the language of the statute, any policy argument strong enough to override the policy of the Arbitration Act. If Congress had intended to forbid arbitration in a suit based on section 12(2), we believe it would have expressed such intent." *Id.* at 445.

11. See Coenen v. R. W. Pressprich & Co., 453 F.2d 1209, 1213 (2d Cir. 1972).

12. In the Summary of Argument in its brief Amicus Curiae in the Supreme Court, the Securities and Exchange Commission relied primarily on statutory policy rather than statutory language: "The arbitration provision should be held invalid because of conflict with the policy of Congress, and as an attempted waiver of the customer's statutory rights prohibited by Section 14 of the Act." Amicus Brief, p. 11. Its public policy argument was also advanced independently of § 14: "Wholly apart from the inclusion of an express anti-waiver provision in a statute, public policy prohibits the recognition and enforcement of stipulations limiting or preventing access to the courts where the statutory rights involved, although conferred on a private party, are affected with a public interest." *Id.* at 23.

13. See Reader v. Hirsch & Co., 197 F. Supp. 111 (S.D.N.Y.1961), holding that a broker could not compel a customer to arbitrate a claim for losses allegedly resulting from a violation of the margin requirement of § 7 of the 1934 Act.

It is interesting to note that in Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838 (2d Cir. 1971), after demonstrating that § 28(b) of the 1934 Act made it perfectly clear that § 29(a) did not preclude enforcement of the compulsory arbitration rules of the New York Stock Exchange, Judge Timbers, who had presented the oral argument on behalf of the S. E. C. in Wilko v. Swan, see 346 U.S. at 427–428, 74 S.Ct. 182, 98 L.Ed. 168, thought it appropriate to add this dictum:
"Moreover, the policy considerations relied on by the Supreme Court in *Wilko* are inapposite here. The Supreme Court found that the non-waiver provision there involved was designed to protect investors. 346 U.S. at 431, 74 S.Ct. 182. Without such provision, financial houses might escape statutory liability by taking advantage of the inferior bargaining position of customers. But the legislative policy of protecting investors will not be thwarted by compelling an exchange member to arbitrate, at the instance of a non-member, a dispute which is arbitrable under the exchange's constitution." *Id.*, 451 F.2d at 842–843.
My appraisal of this case is not supported by a provision comparable to § 28(b), but I consider it plain that the policy of the 1934 Act would not be thwarted by enforcing this agreement, whereas the strong countervailing policy identified by the Chief Justice in *Zapata* will be compromised if it is not enforced.

**620**

which arbitration is entirely appropriate. In my opinion, the fact that the "fraud" language of Rule 10(b)(5) has been included in the complaint is far less significant than the desirability of having the Court of Arbitration of the International Chamber of Commerce in Paris, France, decide the various questions of foreign law which should determine the rights of these parties. I would require this representative of the American business community to honor its bargain.

I respectfully dissent.