496 F.2d 1255
 Fed. Sec. L. Rep. P 94,551
OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA, Appellee,
v.
PAT RYAN & ASSOCIATES, INC., Appellant.
OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA, Appellant,
v.
PAT RYAN & ASSOCIATES, INC., Appellee.
 Nos. 73-2227, 73-2228.
 United States Court of Appeals, Fourth Circuit.
 Argued March 5, 1974.
Decided May 8, 1974.
 
 1
 Richard M. Phillips, Alan J. Berkeley, Gilbert C. Miller, and Gregory T. Diaz, Washington, D.C. (Hill, Christopher & Phillips, P.C., Washington, D.C., George R. Ragsdale, Ragsdale & Liggett, Raleigh, N.C., on briefs), for Occidental Life Ins. Co. of North Carolina.
 
 
 2
 Reuben L. Hedlund, Garrett B. Johnson, Thomas J. O'Brien, Chicago, Ill., J. Melville Broughton, Jr., and Charles P. Wilkins, Raleigh, N.C. (Kirkland & Ellis, O'Brien & Ruken, Chicago, Ill., Broughton, Broughton, McConnell & Boxley, P.A., Raleigh, N.C., on briefs), for Pat Ryan & Associates, Inc.
 
 
 3
 Before CRAVEN and WIDENER, Circuit Judges, and WARD,* District judge.
 
 
 4
 HIRAM H. WARD, District Judge.
 
 
 5
 This is a timely appeal by Occidental Life Insurance Company of North Carolina (Occidental) and cross appeal by Pat Ryan Associates, Inc. (Associates) from judgment of the district court rendered after the second trial to a jury of this matter.
 
 
 6
 The particular controversy here concerns the sale of stock to Associates by Occidental. The sale involved all of the outstanding shares of Virginia Surety Company, Inc. (Virginia Surety). Until right before the sale to Associates, Virginia Surety was owned by Occidental Fire and Casualty Company (Occidental Fire). Occidental Fire is a whollyowned subsidiary of Occidental. Both Occidental Fire and Virginia Surety were primarily engaged in insuring long-haul trucking liability. Virginia Surety held licenses to write this insurance in forty-nine states and the District of Columbia. In the early part of 1969, it was decided to sell Virginia Surety without its agency plant and portfolio of insurance business. Virginia Surety was to be prepared so that it would have no liabilities and only have assets consisting of its charter, state licenses, and bonds on deposit with the insurance commissioners in the various states. The decision to sell was ostensibly made because Occidental Fire had by then acquired licenses in most of the states where Virginia Surety also had licenses.
 
 
 7
 Associates' interest in Virginia Surety arose because it wanted to move into other states. Since Associates was primarily engaged in writing credit life, health, accident and disability insurance in a limited number of states, it would have to amend Virginia Surety's licenses in order to use that company's licenses to expand its business to other states. Nevertheless, Associates evidently felt that it could more readily move into other states if it only needed to amend the existing licenses of Virginia Surety, than if it had to secure approval of the insurance commissioners by making an initial application.
 
 
 8
 On September 18, 1969, Virginia Surety was sold to Occidental, and in turn, on October 22, 1969, Occidental and Associates agreed to sales terms. Associates was to pay Occidental $1,527,000 in cash and three annual payments of $250,000 in the form of reinsurance premiums which Associates would place with Occidental, and which Occidental would immediately reinsure with other companies designated by Associates. The sale price was actually higher than Occidental was asking. The reason for this was because Associates proposed to use the reinsurance plan in order to reduce the amount of cash it would have to pay. 'Since Ryan Associates was already producing this business for others in states where it was not licensed, it would cost Associates nothing more to produce this business for Occidental instead, since its expenses would remain the same.' (Associates Brief, p. 16). If the reinsurance provisions were not performed, Associates was to make the payments in cash. Later, Associates also agreed to make an additional payment of $20,000 in premium income to cover finders' fees incurred by Occidental. The closing took place on October 30, 1969.
 
 
 9
 Associates failed to provide Occidental with the reinsurance payments, and Occidental filed a breach of contract action in state court. The action was removed to federal court, where Associates answered and counterclaimed for breach of warranty and fraud. Nearly two years thereafter, and only ten days before the date set for the first trial, Associates moved to amend its counterclaim in order to assert violations of federal securities laws, and included a request for rescission.[1] The district court granted the motion at the conclusion of the evidence, but denied the request for rescission.
 
 
 10
 In regard to its counterclaim, Associates alleged that before it purchased Virginia Surety the National Association of Insurance Commissioners made an examination of Virginia Surety which showed that the capital of the company was substantially impaired. In September and early October of 1969, Occidental Fire made a contribution to make up the deficit. On October 27, 1969, Virginia Surety accepted the report of the examiners which showed that as of December 31, 1968, Virginia Surety's capital was impaired to the extent of $2,942.04 and that Occidental Fire had made a voluntary contribution to the surplus of the company. Associates claims that misrepresentations and nondisclosure of these facts caused it damage in that after the sale, the State of Connecticut revoked Virginia Surety's license based, at least in part, on the triannual examination report. In February, 1970, the State of Maryland followed Connecticut's lead and also revoked Virginia Surety's license, although it later converted the action to a suspension.
 
 
 11
 Associates also presented evidence of other misrepresentations or nondisclosures which purportedly affected the value and usefulness of Virginia Surety. In June of 1969 the Insurance Commissioner of North Carolina learned that Virginia Surety might be sold. He renewed the license with the understanding that if the company were sold, the new owner would have to requalify. In December 1969, Associates also learned that Virginia Surety had agreed, in October 1969, not to write any new or old renewal insurance in California or Michigan. The two states procured this consent as a condition in order that Occidental Fire could qualify in those states. Thereafter, Associates had to borrow $500,000 to be used to increase the capitalization of Virginia Surety before the two states let that company write insurance.
 
 
 12
 In both the first and second trials the district court granted Occidental's motion for a directed verdict on its breach of contract claim in the amount of $770,000. It also denied Associates' claim of rescission. In both trials, the jury found that Occidental had violated the securities laws and in the first trial awarded damages in the amount of $797,000. The district court set that verdict aside as being grossly contrary to the weight of the evidence and shocking to the conscience of the court. It directed a new trial on all issues. At the second trial, the jury returned a verdict for Associates in the amount of $370,000.
 
 
 13
 Occidental challenges the district court's refusal to direct a verdict in its favor in regard to Associates' counterclaim, and the admission of evidence on the damage issue. Associates asks us to reinstate the first jury verdict and contests the instructions on damages in the second trial. Associates also attacks the directed verdict in favor of Occidental on its breach of contract claim, the district court's denial of rescission, and the award of interest.
 
 I.
 
 14
 THE SALE OF VIRGINIA SURETY CONSTITUTED A SALE OF A 'SECURITY' WITHIN THE PROVISIONS OF THE SECURITIES EXCHANGE ACT OF 1934
 
 
 15
 Occidental contends that the district court erred in holding that the sale of the stock of Virginia Surety constituted a sale of a 'security' as that word is used in Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b),[2] and defined in Section 3(a)(10) of the Exchange Act, 15 U.S.C. 78c(a) (10). It does concede that the sale included an instrument literally covered in Section 3(a)(10), which states: 'The term 'security' means any note, stock, treasury stock, bond, . . ..' It claims that Section 10(b) has the purpose of protecting investors, and thus it is not sufficient to merely show a sale of an instrument literally covered by Section 3(a)(10). Instead, it is said that the transaction must contain some investment element before a sale falls within the purview of Section 10(b). With respect to the sale of Virginia Surety, Occidental contends that it sold a corporate shell including the corporate charter and licenses and deposits in the various states. It says that this alleged sale of business assets does not and should not be the subject of federal securities regulation.
 
 
 16
 The fact that the instruments used in this transaction involve stock and thus come within the literal definition of a 'security' creates a strong presumption that the transaction is covered by Section 10(b). It is not necessary for purposes of Section 10(b) that every instrument used in a sale transaction meet the definition of an 'investment contract' as Occidental seems to contend. As stated in Tcherepnin v. Knight, 389 U.S. 332, 339, 88 S.Ct. 548, 554, 19 L.Ed.2d 564, 571 (1967):
 
 
 17
 Clearly, then, the petitioners' withdrawable capital shares have the essential attributes of investment contracts as that term is used in 3(a)(10) and as it was defined in Howey. But we need not rest our decision on that conclusion alone. 'Instruments may be included within any of (the Act's) definitions, as matter of law, if on their face they answer to the name of description.' S.E.C. v. C. M. Joiner Corp., supra, (320 U.S. 344), at 351 (64 S.Ct. 120, at 123), 88 L.Ed. (88) at 93. The petitioners' shares fit well within several other descriptive terms contained in 3(a)(10).
 
 
 18
 That case indicated that Section a(3)(10) should be read broadly in order to fulfill the remedial purposes of the Securities Exchange Act.
 
 
 19
 Nevertheless, Occidental contends that the sale of business assets is solely a matter of state law concern, that the stock transferred in this case was a mere vehicle used to effectuate the sale of assets, and that the alleged fraud involved the value of those assets but did not directly concern the stock. Thus it says that despite the literal coverage, the sale here was not within the spirit of Section 10(b), which it says is to protect investors in stock, and not buyers of businesses.[3]
 
 
 20
 However, it is inescapable that the sale of Virginia Surety by Occidental was accomplished by the transfer of stock and that there was evidence of fraud in connection with the transfer. The fact that the transfer could have been accomplished in a different way has no significance. Nor does the Court find persuasive the argument that ordinary commercial transactions should be left to the protection of state laws. As stated in Supt. of Insurance v. Bankers L. & C. Co., 404 U.S. 6, 10-12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128, 133-134 (1971):
 
 
 21
 The fact that the fraud was perpetrated by an officer of Manhattan and his outside collaborators is irrelevant to our problem. For 10(b) bans the use of any deceptive device in the 'sale' of any security by 'any person.' And the fact that the transaction is not conducted through a securities exchange or an organized over-the-counter market is irrelevant to the coverage of 10(b). Hooper v. Mountain States Securities Corp., (5 Cir.,) 282 F.2d 195, 201. Likewise irrelevant is the fact that the proceeds of the sale that were due the seller were misappropriated . . .. Hence we do not read 10(b) as narrowly as the Court of Appeals; it is not 'limited to preserving the integrity of the securities markets' (430 F.2d (355), at 361), though that purpose is included. Section 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under 10(b), whatever might be available as a remedy under state law.
 
 
 22
 That case involved the sale of a corporation's Treasury bonds by an officer, who converted the proceeds. While conceding this was not the type of fraud ordinarily associates with the purchase or sale of securities, the Supreme Court made clear that coverage under Section 10(b) should not be read restrictively.
 
 
 23
 We need not speculate as to the result if this transaction did not involve the sale of stock, but rather a simple transfer of assets.[4] That situation is not before us. In this case Occidental sold stock which literally fits the definition of a security. The fact that Associates purchased all of the outstanding stock of Virginia Surety, rather than a small fractional share, cannot serve as a basis for granting or denying coverage under Section 10(b). Bailey v. Meister Brau, Inc., 320 F.Supp. 539 (N.D.Ill.1970); but see Chiodo v. General Waterworks Corporation, 380 F.2d 860, 864 (10th Cir. 1967) (dictum). In both instances, Associates would be making an investment. In this case, Associates sought more than a corporate charter and licenses and deposits in the various states. It needed an on-going corporate enterprise with a good business reputation so that it could expand its business. The application of Section 10(b) cannot depend on whether the purchaser of stock buys a small interest, a controlling interest, or all of the stock, of a corporation. Such a standard would be difficult to apply and create a capricious basis for dispensing the protection of Section 10(b). The Court finds no reason for reading the Securities Exchange Act in a manner that provides coverage of the small investor, but not the large one. Such a construction would fly in the face of the remedial purposes of the Act. In one sense the large investor has a more pressing need for protection to the extent that he has expended a greater amount of his resources. It is entirely irrelevant that the parties could have conducted their business transaction without the use of the stock. The plain fact is that they did choose to use the stock. The transaction literally falls within the terms of Section 10(b), and thus Accociates is entitled to the protection of that section. Supt. of Insurance v. Bankers L. & C. Co., supra. This transaction not only comes within the letter of the law, but within the spirit of it also. The district court properly submitted the counterclaim of Associates to the jury.
 
 
 24
 We further conclude that there was sufficient evidence to support the jury's verdict on Associates' counterclaim. Whatever degree of reliance is needed to prove a Section 10(b) case, see Johns Hopkins University v. Hutton,488 F.2d 912, 914-915 (4th Cir. 1973), the evidence taken in a light most favorable to Associates, the prevailing party on the issue, amply supports the finding of the jury on Associates' counterclaim. Also, the district court did not commit prejudicial error in admitting expert testimony as to Associates' damages. Occidental had ample opportunity to cross-examine Associates' experts and have them explain their testimony. The district court's instruction, as will be discussed later, set out the appropriate standard is regard to damages with which the jury could properly evaluate the expert testimony.
 
 II.
 
 25
 THE DISTRICT COURT DID NOT COMMIT REVERSIBLE ERROR IN SETTING ASIDE THE VERDICT OF THE FIRST TRIAL AND GRANTING A SECOND TRIAL
 
 
 26
 It is a well-established rule that a district court may set aside a verdict and grant a new trial based on the fact that the damage award of the jury is either excessive or inadequate. However, our review of that decision is limited to ascertaining whether the decision amounts to an abuse of discretion. Simmons v. Avisco, Local 713, Textile Workers Union, 350 F.2d 1012 (4th Cir. 1965); Rachesky v. Finklea, 329 F.2d 606 (4th Cir. 1964); and Young v. International Paper Company, 322 F.2d 820 (4th Cir. 1963). After examining the record in regard to the evidence on damages, we cannot conclude that the district court abused its discretion. Associates' own experts testified that the difference in value of Virginia Surety because of the defects amounted to about $200,000. This amount constituted the major portion of Associates' damages. Thus we cannot find the district court abused its discretion in finding that the first verdict of $797,000 was excessive.
 
 III.
 
 27
 THE DISTRICT COURT CORRECTLY INSTRUCTED THE JURY ON THE ISSUE OF DAMAGES
 
 
 28
 Associates challenges the district court's instructions on damages in the second trial.[5] The basic contention is that the district court erred in placing the value of a defect-free Virginia Surety at.$2,297,000, the price the parties had themselves set. Associates contends that Virginia Surety was not worth what Associates itself had determined to be the market value of Virginia Surety without defects. It sought to prove that the fair market value, without defects, was less than the contract price. Thus it claims the court should have let the jury redetermine the market value of the defect-free Virgina Surety, and that in no event should Occidental have been allowed to recover more than that amount. Associates contends that by using the supposedly inflated contract price set by the parties, Occidental will get a windfall and thereby profit by its own wrongdoing. This, Associates claims, Occidental may not do. In support of this contention, it cites the following language in Affiliated Ute Citizens v. United States, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741, 762 (1972):
 
 
 29
 In our view, the correct measure of damages under 28 of the Act, 15 USC 78bb(a), is the difference between the fair value of all that the mixed-blood seller received and the fair value of what he would have received had there been no fraudulent conduct, . . ., except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit. See Janigan v. Taylor, 344 F.2d 781, 786 (CA1 1965), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965).
 
 
 30
 In Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965), cited and relied upon by the Supreme Court as quoted above, the court appears to make the disgorgement of windfall profits theory applicable only to the case of the defrauded seller, and not a defrauded buyer like Associates.[6] However, in Zeller v. Bogue Electric Manufacturing Corporation, 476 F.2d 795, 801-802 (2nd Cir. 1973) (Friendly, C.J.), the court cast doubt on that rule, stating:
 
 
 31
 The reason why the remedy has been applied for the benefit of defrauded sellers but not of buyers is not any decisive legal difference but the difficulty generally confronting the defrauded buyer in showing that the fraudulent seller has in fact reaped such a profit.
 
 
 32
 Nevertheless, even under the rule in Zeller, Associates has not shown, as it must, that Occidental gained a benefit from the transaction that it would not have been in the position to secure had there been no fraud. Zeller, supra, n. 10 at 802. Associates' real quibble is that it paid an allegedly inflated price for a defect-free Virginia Surety. That may show poor business acumen on Associates' part, but utterly fails to prove any windfall profits. The standard for damages applicable to Associates' counterclaim is the difference in the real value of Virginia Surety and the price paid. The district court so instructed.
 
 IV.
 
 33
 THE DISTRICT COURT DID NOT ERR IN DIRECTING A VERDICT ON OCCIDENTAL'S BREACH OF CONTRACT CLAIM
 
 
 34
 Associates claims that the district court erred in directing a verdict for Occidental because Section 29(b) of the Securities Exchange Act, 15 U.S.C. 78cc(b), precluded Occidental from maintaining its action for breach of contract due to its violation of the securities law. Section 29(b) reads in part:
 
 
 35
 (b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and . . ..
 
 
 36
 We do not think Section 29(b) has such a devastating meaning. In Pearlstein v. Scudder & German, 429 F.2d 1136, 1149 (2nd Cir. 1970), Judge Friendly, in his dissent, suggests that the section
 
 
 37
 was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction . . .. There has been a conspicuous lack of judicial enthusiasm for the doctrine thus incorporated when there has been performance by the violator; the reasons are clearly set forth in Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 752-757, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), and Kelly v. Kosuga, 358 U.S. 516, 519-521, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).
 
 
 38
 This view gains credence from the Supreme Court's opinion in Mills v. Electric Auto-lite Co., 396 U.S. 375, 387-388, 90 S.Ct. 616, 623, 24 L.Ed.2d 593, 603-604 (1970), where it said of Section 29(b):
 
 
 39
 This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party, but it does not compel the conclusion that the contract is a nullity, creating no enforceable rights even in a party innocent of the violation. The lower federal courts have read 29(b), . . . as rendering the contract merely voidable at the option of the innocent party . . .. This interpretation is eminently sensible. The interests of the victim are sufficiently protected by giving him the right to rescind; to regard the contract as void where he has not invoked that right would only create the possibility of hardships to him or others without necessarily advancing the statutory policy of disclosure.
 
 
 40
 Thus it would appear that Section 29(b) is more properly viewed as an adjunct to the other remedies provided by the Securities Exchange Act of 1934 and that it should be read as complementing those remedies available to injured parties and not as being antagonistic. The situation here is analogous to that in A. C. Frost & Co. v. Coeur D'Alene Mines Corp., 312 U.S. 38, 61 S.Ct. 414, 85 L.Ed. 500 (1941), which involved a claim that a contract to sell unregistered securities in violation of the Securities Act of 1933 was void and unenforceable. There the court recognized the doctrine of illegal bargains but stated:
 
 
 41
 Here the clear legislative purpose was protection of innocent purchasers of securities. They are given definite remedies inconsistent with the idea that every contract having relation to sales of unregistered shares is absolutely void; and to accept the conclusion reached by the Supreme Court (of Idaho) below would probably seriously hinder rather than aid the real purpose of the statute. (312 U.S. at 43, 61 S.Ct. at 417, 85 L.Ed. at 505.)
 
 
 42
 While the court in Frost noted that the Securities Act of 1933 did not contain a provision making contracts involving unregistered securities void, that distinction does not have a determining importance. Section 29(b) itself is but a general provision which codified the common-law principles already recognized in Frost. Thus we feel the better view of Section 29(b) is that stated by Judge Friendly. Section 29(b) merely makes explicit that which is implicit, i.e., the recognition of the doctrine of illegal bargains in the application of the securities laws.
 
 
 43
 In deciding how to fashion a remedy in the area of illegal bargains, the type and degree of illegality become highly important factors. A. L. Corbin, Corbin on Contracts, Vol. 6A, 1534, pp. 816-20 (1962). The violation of the securities laws in this case did not involve a contract that was illegal per se. Nor did it involve a criminal act. Here the illegality involved a matter collateral to the agreement to sell stock, i.e., the misrepresentations and nondisclosures by Occidental.[7] Moreover, Associates has an ample variety of remedies, both legal and equitable, in order to vindicate the wrong done to it and the public in general. We do not doubt that there may be some cases where public policy would call for enforcement according to the explicit terms of Section 29(b).[8] However, in this case where Associates has remedies under both the 1933 and 1934 Acts, it would not advance the purposes of the securities laws to permit Associates to obtain an unexpected windfall the amount of which depends on the fortuitous factor of how much of a down payment it has made. Such an application of Section 29(b) would serve to nullify those other remedies and substitute a penalty provision.
 
 
 44
 It is our view, however, that Section 29(b) should be read as being in pari materia with the other remedies available under the securities laws, and, as stated in Baumel v. Rosen, 412 F.2d 571, 576 (4th Cir. 1969), concerning Section 10(b), 'it must be recalled that while a defrauding party is not to be excused, neither is he to be punished.' If we should treat the contract as void, Associates would stand to gain double its amount of damages. The result would hardly be equitable. Unless the public interest requires, we are reluctant to nullify a contract which has been executed, and this is especially true where the parties have other remedies at their disposal which will produce an equitable result.
 
 
 45
 Associates attempts to ameliorate the harsh result of treating the contract as void under Section 29(b) by suggesting that we could award Occidental some additional compensation. It suggests that the value of Virginia Surety be redetermined and that Occidental recover that amount rather than the contract price. In reality this approach sounds in quasi-contract where the contract is implied and recovery is determined by the reasonable value of the benefit conferred on the purchaser. The fact that we have determined that there is a valid and enforceable contract compels rejection of that theory. 'There cannot be an express and an implied contract for the same thing existing at the same time.' 66 Am.Jur.2d Restitution and Implied Contracts 6 at 948 (1973). Simply stated, this case presents no basis for use of a quasi-contract theory of recovery. Associates had the option to affirm the contract and sue for damages, or it could elect to rescind.[9]
 
 V.
 RESCISSION
 
 46
 Associates claims error in the district court's denying its alternative requested relief of rescission. It asserts that the basis of its claim for rescission rested on Section 12(2) of the Securities Act of 1933 which it says provides a statutory, as opposed to an equitable, right to rescission, and thus the district court did not have discretion to bar it. Associates further claims that mere passage of time cannot preclude rescission under Section 12(2), and, in any event, Occidental's failure to raise the defenses of waiver and estoppel precludes consideration of those defenses.
 
 
 47
 The recently reported case of Johns Hopkins University v. Hutton, supra, 488 F.2d 912 (4th Cir. 1973), provides a ready answer to most of Associates' contentions. Associates' reliance on Section 12(2) is misplaced. To be entitled to relief under that section, an action must be commenced 'within 'one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence' as required by Section 13 of the '33 Act.' Hopkins, supra, at 914. Moreover, a party must also act with 'reasonable dispatch' if he seeks rescision under Section 10(b) or under Section 17(a) of the Securities Act of 1933. Hopkins, supra, at 917. Since Associates had the burden of proving reasonable dispatch as an essential element for its action of rescission, Occidental was not required to plead estoppel or waiver as an affirmative defense. Hopkins, supra, n. 12 at 915-916.
 
 
 48
 Associates was clearly aware of the problems relating to Virginia Surety by at least the early part of 1970. By the summer of 1970, Associates had held meetings with Occidental concerning these problems, and thus was chargeable with notice of the misstatements and concealments of Occidental. Yet the first mention of rescission took place in Associates' motion to amend its answer and counterclaim in November of 1972. Associates has not met the one year rule of Section 13, nor can the passage of two and one-half years be deemed to show reasonable diligence. In Baumel v. Rosen, supra, the waiting of three years after the agreement and eighteen months after the party was charbeable with knowledge was held to terminate the right to rescission. The delay in this case is particularly onerous since Associates continued to run Virginia Surety as it saw fit. As stated in Baumel v. Rosen, supra, at 575:
 
 
 49
 Further rationale for the requirement of immediacy is that every day's lapse renders more difficult the very aim of rescission: to return the parties to statu quo ante. That obviously is well exampled here.
 
 
 50
 The district court correctly denied Associates' request for rescission.
 
 VI.
 INTEREST AWARD
 
 51
 Associates challenges the award of interest. The district court awarded Occidental interest on the payments due it according to the contract on December 31 of the years 1970, 1971, and 1972. From that sum was to be deducted the interest on Associates' counterclaim award of $370,000. The interest on the counterclaim award was to run from the date of the jury's verdict which was April 28, 1973.
 
 
 52
 It has been well established, at least in Section 16(b) cases involving short swing profits, that an award of prejudgment interest lies within the discretion of the trial court and such interest is not awarded as a matter of course. Gold v. Sloan, 486 F.2d 340 (4th Cir. 1973). This same rule has been held applicable to Section 10(b) cases. Wolf v. Frank, 477 F.2d 467, 469 (5th Cir. 1973); Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir. 1971).
 
 
 53
 Here the violations of the securities laws involved fraud, an element not necessary to a Section 16(b) case. Thus while an award of prejudgment interest in a Section 10(b) case is not automatic, it would seem much more likely to occur than in a Section 16(b) case. (See footnote 6 of this opinion on the measure of damages in a 10(b) case.)
 
 
 54
 Considered separately, it would not be unreasonable to award Occidental prejudgment interest on its liquidated damage claim, nor to deny Associates' prejudgment interest, as done in the court below. However, when combined, it does appear to be inequitable to reward Occidental for its wrongdoing by awarding it interest on that part of the sale price which it cannot recover because of the jury verdict in favor of Associates. This is especially true when it is recalled that we refused to void the contract pursuant to Section 29(b) in order to avoid a harsh inequitable result. Thus if Occidental is to have prejudgment interest, then equity demands that Associates, the innocent party, be accorded no less. We do not think that this decision seriously departs from the district court's own view. Although it did not state the reasons for its award of interest, it is significant that it assessed the costs one half against each party. We, therefore, conclude that Associates should be awarded interest on the amount of the jury verdict from the date of the sale, which was October 30, 1969.
 
 
 55
 While we affirm the judgment of the district court, we remand the case in order that the award of interest may be amended as we have indicated.
 
 
 56
 Affirmed, as modified, and remanded.
 
 
 
 *
 M.D.N.C., sitting by designation
 
 
 [1]
 Associates claimed that Occidental violated Sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. 77l(2) & 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5
 
 
 [2]
 Section 10(b) provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 . . . .e u
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated pursuant to Section 10(b), provides:
 It shall be unlawful for any person directly or indirectly, by the use of any means or instrumenttality of intereste commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.
 
 
 [3]
 This line of reasoning is not without some support. Thus in Lino v. City Investing Co., 487 F.2d 689 (3rd Cir. 1973) the court held that the personal promissory note given by the buyer in order to purchase franchise licensing agreements did not bring the transaction within the Securities Exchange Act's coverage, although literally the transaction would appear to be covered. The court pointed out that the definitional sections of the act, such as Section 3(a)(10), 15 U.S.C. 78c(a)(10) contained the qualification: 'unless the context otherwise requires.' Using this language, the court held that the commercial context of the case before it compelled a finding of no coverage under Section 10(b). It emphasized that the notes were the personal promissory notes of a private party who was the one who claimed to be defrauded, and that the note was not for sale to the public and was not obtained for investment or speculation. It voiced concern that a contrary ruling could bring nearly every retail credit transaction under control of the federal securities laws. (It noted that other courts have reached differing conclusions on whether the purchase or sale of notes between private parties constitutes a sale of securities. See n. 11-13, at 694. It said that none of those cases, where jurisdiction was found to exist, contained all of the factors present in its case.)
 ,None of these special circumstances appear in the instant case. Rather the sale of Virginia Surety more closely resembles an ordinary stock transaction. The stock of Virginia Surety involved stock which any member of the Public could own. Occidental was ready to offer Virginia to any member of the public who would purchase it. The injury caused by the alleged fraud directly affected the value of the stock. Finally, as will be discussed later, Associates' purchase of Virginia Surety involved an investment. Without approving the decision in Lino v. City Investing Co., supra, those facts sufficiently distinguish this case from it so as to make that decision inapplicable to the facts here.
 
 
 [4]
 Some courts have held that the sale of assets with a concomitant use of instruments that literally meet the definition of a 'security' in Section 3(a) (10) is sufficient to predicate liability under Section 10(b). See cases cited in n. 11, Lino v. City Investing Co., supra, at 694. Thus in Alberto-Culver Company v. Scherk, 484 F.2d 611, 615 (7th Cir. 1973), the court held:
 This mandate (stated in Tcherepnin v. Knight, supra) to construe broadly the term 'security' compels our conclusion that the agreement to incorporate the SEV entity, and to transfer the assets of the SEV, FLS, and Lodeva entities in exchange for cash and promissory notes involves a 'security' within the meaning of the Securities Exchange Act of 1934. Movielab, Inc. v. Berkey Photo, Inc., 452 F.2d 662 (2nd Cir. 1971); Lawrence v. Securities and Exchange Comm., 398 F.2d 276 (1st Cir. 1968).
 See also Vincent v. Moench, 473 F.2d 430 (10th Cir. 1973).
 
 
 [5]
 The court's instruction, in pertinent part, was as follows:
 The measure of damages is the difference between the price paid by the buyer on the basis of the facts known to him and the price he would have paid had he known of the misrepresentations.
 In other words, you must determine how much less than the agreed price, Virginia Surety was worth to the defendant had it known of the omissions and misrepresentations of the plaintiff.
 This part of the charge is substantially the same as that given without objection in the first trial, and substantially the same as Associates' own requested instruction numbers 25 and 26. Associates did, however, object to the district court's instruction in the second trial.
 
 
 [6]
 In that case, the court set out the standard for recovery as follows:
 With respect to damages we draw a distinction between cases where, by fraud, one is caused to buy something that one would not have bought or would not have bought at that price, and where, by fraud one is induced to convey property to the fraudulent party. In the former case the damages are to be reckoned solely by 'the difference between the real value of the property at the date of its sale to the plaintiffs and the price paid for it, with interest from that date, and, in addition, such outlays as were legitimately attributable to the defendant's conduct, but not damages covering 'the expected fruits of an unrealized speculation." On the other hand, if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.
 
 
 [7]
 There has been some though that Section 29(b) may only apply to contracts that by their own terms violate the securities laws. Naftalin & Co. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 469 F.2d 1166, 1182, n. 25 (8th Cir. 1972). See A. C. Frost & Co. v. Coeur D'Alene Mines Corp., supra, 312 U.S. at 42, 61 S.Ct. at 417, L.Ed. at 505, where the court thought it important that 'the challenged contract bears no evidence of criminality and is fair upon its face, . . ..' In light of our ultimate disposition, we do not reach that issue. Nevertheless, those factors may be considered in balancing the equities in deciding how to enforce the parties' rights under an illegal bargain
 
 
 [8]
 Serzysko v. Chase Manhatten Bank, 290 F.Supp. 74 (S.D.N.Y.1968), aff'd per curiam, 409 F.2d 1360 (2nd Cir. 1969), and Cooper v. Union Bank, 354 F.Supp. 669 (C.D.Cal.1973)-- both cases involved the making of loans by a bank in violation of Regulation U, promulgated pursuant to Section 7 of the Securities Exchange Act of 1934, 15 U.S.C. 78g. The banks were not permitted to recover cover the outstanding balance due on the loans. But see Goldman v. Bank of Commonwealth, 467 F.2d 439 (6th Cir. 1972), where the court considered that the equities of the situation dictated that it grant rescission thereby allowing the bank to recover the principal amount of the loan it made, but not the interest
 
 
 [9]
 As will be discussed in the next section of this opinion, Associates by its dilatory action has lost its right to rescission. We are not disposed to grant Associates under Section 29(b) that right which it has already lost. Principles of equity, like estoppel and waiver, apply equally to actions brought under Section 29(b), as well as those brought under Section 10(b). Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962)