(Slip Opinion)          OCTOBER  TERM,  2008                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## 14 PENN PLAZA LLC ET AL. *v.* PYETT ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 07–581.   Argued December 1, 2008—Decided April 1, 2009

Respondents are members of the Service Employees International Union, Local 32BJ (Union).  Under the National Labor Relations Act, the Union is the exclusive bargaining representative of employees within the building-services industry in New York City, which includes building cleaners, porters, and doorpersons.  The Union has exclusive authority to bargain on behalf of its members over their "rates of pay, wages, hours of employment, or other conditions of employment," 29 U. S. C. §159(a), and engages in industry-wide collective bargaining with the Realty Advisory Board on Labor Relations, Inc. (RAB), a multiemployer bargaining association for the New York City real-estate industry.  The agreement between the Union and the RAB is embodied in their Collective Bargaining Agreement for Contractors and Building Owners (CBA).  The CBA requires union members to submit all claims of employment discrimination to binding arbitration under the CBA's grievance and dispute resolution procedures.

Petitioner 14 Penn Plaza LLC is a member of the RAB.  It owns and operates the New York City office building where respondents worked as night lobby watchmen and in other similar capacities.  Respondents were directly employed by petitioner Temco Service Industries, Inc. (Temco), a maintenance service and cleaning contractor.  After 14 Penn Plaza, with the Union's consent, engaged a unionized security contractor affiliated with Temco to provide licensed security guards for the building, Temco reassigned respondents to jobs as porters and cleaners.  Contending that these reassignments led to a loss in income, other damages, and were otherwise less desirable than their former positions, respondents asked the Union to file grievances alleging, among other things, that petitioners violated the CBA's ban

on workplace discrimination by reassigning respondents on the basis of their age in violation of Age Discrimination in Employment Act of 1967 (ADEA), 29 U. S. C. §621 *et seq.* The Union requested arbitration under the CBA, but after the initial hearing, withdrew the age-discrimination claims on the ground that its consent to the new security contract precluded it from objecting to respondents' reassignments as discriminatory. Respondents then filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that petitioners had violated their ADEA rights, and the EEOC issued each of them a right-to-sue notice. In the ensuing lawsuit, the District Court denied petitioners' motion to compel arbitration of respondents' age discrimination claims. The Second Circuit affirmed, holding that *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, forbids enforcement of collective-bargaining provisions requiring arbitration of ADEA claims.

*Held:* A provision in a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate ADEA claims is enforceable as a matter of federal law. Pp. 6–25.

  (a) Examination of the two federal statutes at issue here, the ADEA and the National Labor Relations Act (NLRA), yields a straightforward answer to the question presented. The Union and the RAB, negotiating on behalf of 14 Penn Plaza, collectively bargained in good faith and agreed that employment-related discrimination claims, including ADEA claims, would be resolved in arbitration. This freely negotiated contractual term easily qualifies as a "conditio[n] of employment" subject to mandatory bargaining under the NLRA, 29 U. S. C. §159(a). See, *e.g., Litton Financial Printing Div., Litton Business Systems, Inc.* v. *NLRB*, 501 U. S. 190, 199. As in any contractual negotiation, a union may agree to the inclusion of an arbitration provision in a collective-bargaining agreement in return for other concessions from the employer, and courts generally may not interfere in this bargained-for exchange. See *NLRB* v. *Magnavox Co.*, 415 U. S. 322, 328. Thus, the CBA's arbitration provision must be honored unless the ADEA itself removes this particular class of grievances from the NLRA's broad sweep. See *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 628. It does not. This Court has squarely held that the ADEA does not preclude arbitration of claims brought under the statute. See *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20, 26–33. Pp. 6–10. Accordingly, there is no legal basis for the Court to strike down the arbitration clause in this CBA, which was freely negotiated by the Union and the RAB, and which clearly and unmistakably requires respondents to arbitrate the age-discrimination claims at issue in this appeal. Pp. 6–10.

(b) The CBA's arbitration provision is also fully enforceable under the *Gardner-Denver* line of cases. Respondents incorrectly interpret *Gardner-Denver* and its progeny as holding that an agreement to arbitrate ADEA claims provided for in a collective-bargaining agreement cannot waive an individual employee's right to a judicial forum under federal antidiscrimination statutes.. Pp. 11–23.

(i) The facts underlying *Gardner-Denver* and its progeny reveal the narrow scope of the legal rule they engendered. Those cases "did not involve the issue of the enforceability of an agreement to arbitrate statutory claims," but "the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims." *Gilmer, supra,* at 35. *Gardner-Denver* does not control the outcome where, as here, the collective-bargaining agreement's arbitration provision expressly covers both statutory and contractual discrimination claims. Pp. 11–15.

(ii) Apart from their narrow holdings, the *Gardner-Denver* line of cases included broad dicta highly critical of using arbitration to vindicate statutory antidiscrimination rights. That skepticism, however, rested on a misconceived view of arbitration that this Court has since abandoned. First, contrary to *Gardner-Denver*'s erroneous assumption, 415 U. S., at 51, the decision to resolve ADEA claims by way of arbitration instead of litigation does not waive the statutory right to be free from workplace age discrimination; it waives only the right to seek relief from a court in the first instance, see, *e.g., Gilmer, supra,* at 26. Second, *Gardner-Denver*'s mistaken suggestion that certain informal features of arbitration made it a forum "well suited to the resolution of contractual disputes," but "a comparatively inappropriate forum for the final resolution of [employment] rights." 415 U. S., at 56, has been corrected. See, *e.g., Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 232. Third, *Gardner-Denver*'s concern that, in arbitration, a union may subordinate an individual employee's interests to the collective interests of all employees in the bargaining unit, 415 U. S., at 58, n. 19, cannot be relied on to introduce a qualification into the ADEA that is not found in its text. Until Congress amends the ADEA to meet the conflict-of-interest concern identified in the *Gardner-Denver* dicta, there is "no reason to color the lens through which the arbitration clause is read." *Mitsubishi, supra,* at 628. In any event, the conflict-of-interest argument amounts to an unsustainable collateral attack on the NLRA, see *Emporium Capwell Co.* v. *Western Addition Community Organization*, 420 U. S. 50, 62, and Congress has accounted for the conflict in several ways: union members may bring a duty of fair representation claim against the union; a union can be subjected to direct liability under the ADEA if it discriminates on the basis of age; and union

Syllabus

members may also file age-discrimination claims with the EEOC and the National Labor Relations Board. Pp. 15–23.

(c) Because respondents' arguments that the CBA does not clearly and unmistakably require them to arbitrate their ADEA claims were not raised in the lower courts, they have been forfeited. Moreover, although a substantive waiver of federally protected civil rights will not be upheld, see, *e.g., Mitsubishi, supra,* at 637, and n. 19, this Court is not positioned to resolve in the first instance respondents' claim that the CBA allows the Union to prevent them from effectively vindicating their federal statutory rights in the arbitral forum, given that this question would require resolution of contested factual allegations, was not fully briefed here or below, and is not fairly encompassed within the question presented. Resolution now would be particularly inappropriate in light of the Court's hesitation to invalidate arbitration agreements based on speculation. See, *e.g.*, *Green Tree Financial Corp.-Ala.* v. *Randolph*, 531 U. S. 79. Pp. 23–25.

498 F. 3d 88, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–581

## 14 PENN PLAZA LLC, ET AL., PETITIONERS *v.* STEVEN PYETT ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 1, 2009]

JUSTICE THOMAS delivered the opinion of the Court.

The question presented by this case is whether a provision in a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate claims arising under the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. §621 *et seq.*, is enforceable. The United States Court of Appeals for the Second Circuit held that this Court's decision in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974), forbids enforcement of such arbitration provisions. We disagree and reverse the judgment of the Court of Appeals.

I

Respondents are members of the Service Employees International Union, Local 32BJ (Union). Under the National Labor Relations Act (NLRA), 49 Stat. 449, as amended, the Union is the exclusive bargaining representative of employees within the building-services industry in New York City, which includes building cleaners, porters, and doorpersons. See 29 U. S. C. §159(a). In this role, the Union has exclusive authority to bargain on

behalf of its members over their "rates of pay, wages, hours of employment, or other conditions of employment." *Ibid.* Since the 1930's, the Union has engaged in industry-wide collective bargaining with the Realty Advisory Board on Labor Relations, Inc. (RAB), a multiemployer bargaining association for the New York City real-estate industry. The agreement between the Union and the RAB is embodied in their Collective Bargaining Agreement for Contractors and Building Owners (CBA). The CBA requires union members to submit all claims of employment discrimination to binding arbitration under the CBA's grievance and dispute resolution procedures:

> "§30 NO DISCRIMINATION. There shall be no discrimination against any present or future employee by reason of race, creed, color, age, disability, national origin, sex, union membership, or any other characteristic protected by law, including, but not limited to, claims made pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the New York State Human Rights Law, the New York City Human Rights Code, . . . or any other similar laws, rules, or regulations. All such claims shall be subject to the grievance and arbitration procedures (Articles V and VI) as the sole and exclusive remedy for violations. Arbitrators shall apply appropriate law in rendering decisions based upon claims of discrimination." App. to Pet. for Cert. 48a.[1]

---

[1] Article V establishes the grievance process, which applies to all claims regardless of whether they are subject to arbitration under the CBA. Article VI establishes the procedures for arbitration and postarbitration judicial review, and, in particular, provides that the arbitrator "shall . . . decide all differences arising between the parties as to interpretation, application or performance of any part of this Agreement and such other issues as the parties are expressly required to arbitrate

   Petitioner 14 Penn Plaza LLC is a member of the RAB.
It owns and operates the New York City office building
where, prior to August 2003, respondents worked as night
lobby watchmen and in other similar capacities. Respon-
dents were directly employed by petitioner Temco Service
Industries, Inc. (Temco), a maintenance service and clean-
ing contractor. In August 2003, with the Union's consent,
14 Penn Plaza engaged Spartan Security, a unionized
security services contractor and affiliate of Temco, to
provide licensed security guards to staff the lobby and
entrances of its building. Because this rendered respon-
dents' lobby services unnecessary, Temco reassigned them
to jobs as night porters and light duty cleaners in other
locations in the building. Respondents contend that these
reassignments led to a loss in income, caused them emo-
tional distress, and were otherwise less desirable than
their former positions.
   At respondents' request, the Union filed grievances
challenging the reassignments. The grievances alleged
that petitioners: (1) violated the CBA's ban on workplace
discrimination by reassigning respondents on account of
their age; (2) violated seniority rules by failing to promote
one of the respondents to a handyman position; and (3)
failed to equitably rotate overtime. After failing to obtain
relief on any of these claims through the grievance proc-
ess, the Union requested arbitration under the CBA.
   After the initial arbitration hearing, the Union with-
drew the first set of respondents' grievances—the age-
discrimination claims—from arbitration. Because it had
consented to the contract for new security personnel at 14
Penn Plaza, the Union believed that it could not legiti-
mately object to respondents' reassignments as discrimi-
natory. But the Union continued to arbitrate the seniority

——————

before him under the terms of this Agreement." App. to Pet. for Cert.
43a–47a.

and overtime claims, and, after several hearings, the claims were denied.

In May 2004, while the arbitration was ongoing but after the Union withdrew the age-discrimination claims, respondents filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that petitioners had violated their rights under the ADEA. Approximately one month later, the EEOC issued a Dismissal and Notice of Rights, which explained that the agency's "'review of the evidence . . . fail[ed] to indicate that a violation ha[d] occurred,'" and notified each respondent of his right to sue. *Pyett* v. *Pennsylvania Building Co.*, 498 F. 3d 88, 91 (CA2 2007).

Respondents thereafter filed suit against petitioners in the United States District Court for the Southern District of New York, alleging that their reassignment violated the ADEA and state and local laws prohibiting age discrimination.[2] Petitioners filed a motion to compel arbitration of respondents' claims pursuant to §3 and §4 of the Federal Arbitration Act (FAA), 9 U. S. C. §§3, 4.[3] The District Court denied the motion because under Second Circuit precedent, "even a clear and unmistakable union-

_____

[2] Respondents also filed a "hybrid" lawsuit against the Union and petitioners under §301 of the Labor Management Relations Act, 1947, 29 U. S. C. §185, see also *DelCostello* v. *Teamsters*, 462 U. S. 151, 164–165 (1983), alleging that the Union breached its "duty of fair representation" under the NLRA by withdrawing support for the age-discrimination claims during the arbitration and that petitioners breached the CBA by reassigning respondents. Respondents later voluntarily dismissed this suit with prejudice.

[3] Petitioners also filed a motion to dismiss the complaint for failure to state a claim. The District Court denied the motion, holding that respondents had sufficiently alleged an ADEA claim by claiming that they "were over the age of 40, . . . they were reassigned to positions which led to substantial losses in income, and . . . their replacements were both younger and had less seniority at the building." App. to Pet. for Cert. 20a (footnote omitted). Petitioners have not appealed that ruling.

negotiated waiver of a right to litigate certain federal and state statutory claims in a judicial forum is unenforceable." App. to Pet. for Cert. 21a. Respondents immediately appealed the ruling under §16 of the FAA, which authorizes an interlocutory appeal of "an order . . . refusing a stay of any action under section 3 of this title" or "denying a petition under section 4 of this title to order arbitration to proceed." 9 U. S. C. §§16(a)(1)(A)–(B).

The Court of Appeals affirmed. 498 F. 3d 88. According to the Court of Appeals, it could not compel arbitration of the dispute because *Gardner-Denver*, which "remains good law," held "that a collective bargaining agreement could not waive covered workers' rights to a judicial forum for causes of action created by Congress." 498 F. 3d, at 92, 91, n. 3 (citing *Gardner-Denver*, 415 U. S., at 49–51). The Court of Appeals observed that the *Gardner-Denver* decision was in tension with this Court's more recent decision in *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20 (1991), which "held that an individual employee who had agreed individually to waive his right to a federal forum *could* be compelled to arbitrate a federal age discrimination claim." 498 F. 3d, at 91, n. 3 (citing *Gilmer*, *supra,* at 33–35; emphasis in original). The Court of Appeals also noted that this Court previously declined to resolve this tension in *Wright* v. *Universal Maritime Service Corp.*, 525 U. S. 70, 82 (1998), where the waiver at issue was not "clear and unmistakable." 498 F. 3d, at 91, n. 3.

The Court of Appeals attempted to reconcile *Gardner-Denver* and *Gilmer* by holding that arbitration provisions in a collective-bargaining agreement, "which purport to waive employees' rights to a federal forum with respect to statutory claims, are unenforceable." 498 F. 3d, at 93–94. As a result, an individual employee would be free to choose compulsory arbitration under *Gilmer*, but a labor union could not collectively bargain for arbitration on behalf of its members. We granted certiorari, 552 U. S.

___ (2008), to address the issue left unresolved in *Wright*, which continues to divide the Courts of Appeals,[4] and now reverse.

## II

### A

The NLRA governs federal labor-relations law. As permitted by that statute, respondents designated the Union as their "exclusive representativ[e] . . . for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U. S. C. §159(a). As the employees' exclusive bargaining representative, the Union "enjoys broad authority . . . in the negotiation and administration of [the] collective bargaining contract." *Communications Workers* v. *Beck*, 487 U. S. 735, 739 (1988) (internal quotation marks omitted). But this broad authority "is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation." *Humphrey* v. *Moore*, 375 U. S. 335, 342 (1964). The employer has a corresponding duty under the NLRA to bargain in good faith "with the representatives of his employees" on wages, hours, and conditions of employment. 29 U. S. C. §158(a)(5); see also §158(d).

In this instance, the Union and the RAB, negotiating on behalf of 14 Penn Plaza, collectively bargained in good faith and agreed that employment-related discrimination claims, including claims brought under the ADEA, would be resolved in arbitration. This freely negotiated term between the Union and the RAB easily qualifies as a "conditio[n] of employment" that is subject to mandatory

---

[4] Compare*, e.g.*, *Rogers* v. *New York Univ.*, 220 F. 3d 73, 75 (CA2 2000) *(per curiam); O'Brien* v. *Agawam,* 350 F. 3d 279, 285 (CA1 2003); *Mitchell* v. *Chapman,* 343 F. 3d 811, 824 (CA6 2003); *Tice* v. *American Airlines, Inc.*, 288 F. 3d 313, 317 (CA7 2002), with*, e.g.*, *Eastern Associated Coal Corp.* v. *Massey,* 373 F. 3d 530, 533 (CA4 2004).

bargaining under §159(a). See *Litton Financial Printing Div., Litton Business Systems, Inc.* v. *NLRB*, 501 U. S. 190, 199 (1991) ("[A]rrangements for arbitration of disputes are a term or condition of employment and a mandatory subject of bargaining"); *Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 578 (1960) ("[A]rbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself"); *Textile Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448, 455 (1957) ("Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike"). The decision to fashion a CBA to require arbitration of employment-discrimination claims is no different from the many other decisions made by parties in designing grievance machinery.[5]

Respondents, however, contend that the arbitration clause here is outside the permissible scope of the collective-bargaining process because it affects the "employees' individual, non-economic statutory rights." Brief for Respondents 22; see also *post*, at 5–6 (SOUTER, J., dissenting). We disagree. Parties generally favor arbitration

_____

[5]JUSTICE SOUTER claims that this understanding is "impossible to square with our conclusion in [*Alexander* v.] *Gardner-Denver* [*Co.*, 415 U. S. 36 (1974)] that 'Title VII . . . stands on plainly different ground' from 'statutory rights related to collective activity': 'it concerns not majoritarian processes, but an individual's right to equal employment opportunities.'" *Post*, at 5 (dissenting opinion) (quoting *Gardner-Denver*, 415 U. S., at 51). As explained below, however, JUSTICE SOUTER repeats the key analytical mistake made in *Gardner-Denver*'s dicta by equating the decision to arbitrate Title VII and ADEA claims to a decision to forgo these substantive guarantees against workplace discrimination. See *infra*, at 15–17. The right to a judicial forum is not the nonwaivable "substantive" right protected by the ADEA. See *infra*, at 9, 24. Thus, although Title VII and ADEA rights may well stand on "different ground" than statutory rights that protect "majoritarian processes," *Gardner-Denver*, *supra*, at 51, the voluntary decision to collectively bargain for arbitration does not deny those statutory antidiscrimination rights the full protection they are due.

precisely because of the economics of dispute resolution. See *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 123 (2001) ("Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation, which often involves smaller sums of money than disputes concerning commercial contracts"). As in any contractual negotiation, a union may agree to the inclusion of an arbitration provision in a collective-bargaining agreement in return for other concessions from the employer. Courts generally may not interfere in this bargained-for exchange. "Judicial nullification of contractual concessions . . . is contrary to what the Court has recognized as one of the fundamental policies of the National Labor Relations Act—freedom of contract." *NLRB* v. *Magnavox Co.*, 415 U. S. 322, 328 (1974) (Stewart, J., concurring in part and dissenting in part) (internal quotation marks and brackets omitted).

As a result, the CBA's arbitration provision must be honored unless the ADEA itself removes this particular class of grievances from the NLRA's broad sweep. See *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 628 (1985). It does not. This Court has squarely held that the ADEA does not preclude arbitration of claims brought under the statute. See *Gilmer*, 500 U. S., at 26–33.

In *Gilmer*, the Court explained that "[a]lthough all statutory claims may not be appropriate for arbitration, 'having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Id.*, at 26 (quoting *Mitsubishi Motors Corp.*, *supra,* at 628). And "if Congress intended the substantive protection afforded by the ADEA to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." 500 U. S., at 29 (internal quotation marks and brackets

omitted). The Court determined that "nothing in the text of the ADEA or its legislative history explicitly precludes arbitration." *Id.*, at 26–27. The Court also concluded that arbitrating ADEA disputes would not undermine the statute's "remedial and deterrent function." *Id.*, at 28 (internal quotation marks omitted). In the end, the employee's "generalized attacks" on "the adequacy of arbitration procedures" were "insufficient to preclude arbitration of statutory claims," *id.,* at 30, because there was no evidence that "Congress, in enacting the ADEA, intended to preclude arbitration of claims under that Act," *id.,* at 35.

The *Gilmer* Court's interpretation of the ADEA fully applies in the collective-bargaining context. Nothing in the law suggests a distinction between the status of arbitration agreements signed by an individual employee and those agreed to by a union representative. This Court has required only that an agreement to arbitrate statutory antidiscrimination claims be "explicitly stated" in the collective-bargaining agreement. *Wright*, 525 U. S., at 80 (internal quotation marks omitted). The CBA under review here meets that obligation. Respondents incorrectly counter that an individual employee must personally "waive" a "[substantive] right" to proceed in court for a waiver to be "knowing and voluntary" under the ADEA. 29 U. S. C. §626(f)(1). As explained below, however, the agreement to arbitrate ADEA claims is not the waiver of a "substantive right" as that term is employed in the ADEA. *Wright*, *supra,* at 80; see *infra*, at 15–16. Indeed, if the "right" referred to in §626(f)(1) included the prospective waiver of the right to bring an ADEA claim in court, even a waiver signed by an individual employee would be invalid as the statute also prevents individuals from "waiv[ing] rights or claims that may arise after the date the waiver is executed." §626(f)(1)(C).[6]

————————

[6] Respondents' contention that §118 of the Civil Rights Act of 1991,

Examination of the two federal statutes at issue in this case, therefore, yields a straightforward answer to the question presented: The NLRA provided the Union and the RAB with statutory authority to collectively bargain for arbitration of workplace discrimination claims, and Congress did not terminate that authority with respect to federal age-discrimination claims in the ADEA. Accordingly, there is no legal basis for the Court to strike down the arbitration clause in this CBA, which was freely negotiated by the Union and the RAB, and which clearly and unmistakably requires respondents to arbitrate the age-discrimination claims at issue in this appeal. Congress

———————

Pub. L. 102–166, 105 Stat. 1081, note following 42 U. S. C. §1981 (2000 ed.), precludes the enforcement of this arbitration agreement also is misplaced. See Brief for Respondents 31–32; see also *post*, at 8–9 (SOUTER, J., dissenting). Section 118 expresses Congress' support for alternative dispute resolution: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under" the ADEA. 105 Stat. 1081, note following 42 U. S C. §1981. Respondents argue that the legislative history actually signals Congress' intent to preclude arbitration waivers in the collective-bargaining context. In particular, respondents point to a House Report that, in spite of the statute's plain language, interprets §118 to support their position. See H. R. Rep. No. 102–40, pt. 1, p. 97 (1991) ("[A]ny agreement to submit disputed issues to arbitration . . . in the context of a collective bargaining agreement . . . does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974)"). But the legislative history mischaracterizes the holding of *Gardner-Denver*, which does not prohibit collective bargaining for arbitration of ADEA claims. See *infra,* at 11–14. Moreover, reading the legislative history in the manner suggested by respondents would create a direct conflict with the statutory text, which encourages the use of arbitration for dispute resolution without imposing any constraints on collective bargaining. In such a contest, the text must prevail. See *Ratzlaf* v. *United States*, 510 U. S. 135, 147–148 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear").

has chosen to allow arbitration of ADEA claims. The Judiciary must respect that choice.

## B

The CBA's arbitration provision is also fully enforceable under the *Gardner-Denver* line of cases. Respondents interpret *Gardner-Denver* and its progeny to hold that "a union cannot waive an employee's right to a judicial forum under the federal antidiscrimination statutes" because "allowing the union to waive this right would substitute the union's interests for the employee's antidiscrimination rights." Brief for Respondents 12. The "combination of union control over the process and inherent conflict of interest with respect to discrimination claims," they argue, "provided the foundation for the Court's holding [in *Gardner-Denver*] that arbitration under a collective-bargaining agreement could not preclude an individual employee's right to bring a lawsuit in court to vindicate a statutory discrimination claim." *Id.*, at 15. We disagree.

### 1

The holding of *Gardner-Denver* is not as broad as respondents suggest. The employee in that case was covered by a collective-bargaining agreement that prohibited "discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry" and that guaranteed that "[n]o employee will be discharged . . . except for just cause." 415 U. S., at 39 (internal quotation marks omitted). The agreement also included a "multistep grievance procedure" that culminated in compulsory arbitration for any "differences aris[ing] between the Company and the Union as to the meaning and application of the provisions of this Agreement" and "any trouble aris[ing] in the plant." *Id.*, at 40–41 (internal quotation marks omitted).

The employee was discharged for allegedly producing too many defective parts while working for the respondent

as a drill operator.  He filed a grievance with his union claiming that he was "'unjustly discharged'" in violation of the "'just cause'" provision within the CBA.  Then at the final prearbitration step of the grievance process, the employee added a claim that he was discharged because of his race.  *Id.*, at 38–42.

The arbitrator ultimately ruled that the employee had been "'discharged for just cause,'" but "made no reference to [the] claim of racial discrimination."  *Id.*, at 42.  After obtaining a right-to-sue letter from the EEOC, the employee filed a claim in Federal District Court, alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964.  The District Court issued a decision, affirmed by the Court of Appeals, which granted summary judgment to the employer because it concluded that "the claim of racial discrimination had been submitted to the arbitrator and resolved adversely to [the employee]."  *Id.*, at 43.  In the District Court's view, "having voluntarily elected to pursue his grievance to final arbitration under the nondiscrimination clause of the collective-bargaining agreement," the employee was "bound by the arbitral decision" and precluded from suing his employer on any other grounds, such as a statutory claim under Title VII.  *Ibid.*

This Court reversed the judgment on the narrow ground that the arbitration was not preclusive because the collective-bargaining agreement did not cover statutory claims.  As a result, the lower courts erred in relying on the "doctrine of election of remedies" to bar the employee's Title VII claim.  *Id.*, at 49.  "That doctrine, which refers to situations where an individual pursues remedies that are legally or factually inconsistent" with each other, did not apply to the employee's dual pursuit of arbitration and a Title VII discrimination claim in district court.  The employee's collective-bargaining agreement did not mandate arbitration of statutory antidiscrimination claims.  *Id.*, at

49–50. "As the proctor of the bargain, the arbitrator's task is to effectuate the intent of the parties." *Id.*, at 53. Because the collective-bargaining agreement gave the arbitrator "authority to resolve only questions of contractual rights," his decision could not prevent the employee from bringing the Title VII claim in federal court "regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII." *Id.*, at 53–54; see also *id.*, at 50.

The Court also explained that the employee had not waived his right to pursue his Title VII claim in federal court by participating in an arbitration that was premised on the same underlying facts as the Title VII claim. See *id.,* at 52. Thus, whether the legal theory of preclusion advanced by the employer rested on "the doctrines of election of remedies" or was recast "as resting instead on the doctrine of equitable estoppel and on themes of res judicata and collateral estoppel," *id.*, at 49, n. 10 (internal quotation marks omitted), it could not prevail in light of the collective-bargaining agreement's failure to address arbitration of Title VII claims. See *id.*, at 46, n. 6 ("[W]e hold that the federal policy favoring arbitration does not establish that an arbitrator's resolution of a *contractual* claim is dispositive of a statutory claim under Title VII" (emphasis added)).

The Court's decisions following *Gardner-Denver* have not broadened its holding to make it applicable to the facts of this case. In *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728 (1981), the Court considered "whether an employee may bring an action in federal district court, alleging a violation of the minimum wage provisions of the Fair Labor Standards Act, . . . after having unsuccessfully submitted a wage claim based on the same underlying facts to a joint grievance committee pursuant to the provisions of his union's collective-bargaining agreement." *Id.*, at 729–730. The Court held

that the unsuccessful arbitration did not preclude the federal lawsuit. Like the collective-bargaining agreement in *Gardner-Denver*, the arbitration provision under review in *Barrentine* did not expressly reference the statutory claim at issue. See 450 U. S., at 731, n. 5. The Court thus reiterated that an "arbitrator's power is both derived from, and limited by, the collective-bargaining agreement" and "[h]is task is limited to construing the meaning of the collective-bargaining agreement so as to effectuate the collective intent of the parties." *Id.*, at 744.

*McDonald* v. *West Branch*, 466 U. S. 284 (1984), was decided along similar lines. The question presented in that case was "whether a federal court may accord preclusive effect to an unappealed arbitration award in a case brought under [42 U. S. C. §1983]." *Id.*, at 285. The Court declined to fashion such a rule, again explaining that "because an arbitrator's authority derives solely from the contract, *Barrentine*, *supra,* at 744, an arbitrator may not have authority to enforce §1983" when that provision is left unaddressed by the arbitration agreement. *Id.*, at 290. Accordingly, as in both *Gardner-Denver* and *Barrentine*, the Court's decision in *McDonald* hinged on the scope of the collective-bargaining agreement and the arbitrator's parallel mandate.

The facts underlying *Gardner-Denver*, *Barrentine*, and *McDonald* reveal the narrow scope of the legal rule arising from that trilogy of decisions. Summarizing those opinions in *Gilmer*, this Court made clear that the *Gardner-Denver* line of cases "did not involve the issue of the enforceability of an agreement to arbitrate statutory claims." 500 U. S., at 35. Those decisions instead "involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration

in those cases understandably was held not to preclude subsequent statutory actions." *Ibid.;* see also *Wright*, 525 U. S., at 76; *Livadas* v. *Bradshaw*, 512 U. S. 107, 127, n. 21 (1994).[7] *Gardner-Denver* and its progeny thus do not control the outcome where, as is the case here, the collective-bargaining agreement's arbitration provision expressly covers both statutory and contractual discrimination claims.[8]

———————

[7] JUSTICE SOUTER's reliance on *Wright* v. *Universal Maritime Service Corp.*, 525 U. S. 70 (1998), to support its view of *Gardner-Denver* is misplaced. See *post*, at 5, 7. *Wright* identified the "tension" between the two lines of cases represented by *Gardner-Denver* and *Gilmer*, but found "it unnecessary to resolve the question of the validity of a union-negotiated waiver, since it [was] apparent . . . on the facts and arguments presented . . . that no such waiver [had] occurred." 525 U. S., at 76–77. And although his dissent describes *Wright*'s characterization of *Gardner-Denver* as "raising a 'seemingly absolute prohibition of union waiver of employees' federal forum rights,'" *post*, at 7 (quoting *Wright*, 525 U. S*.,* at 80), it wrenches the statement out of context: "Although [the right to a judicial forum] is not a substantive right, see *Gilmer*, 500 U. S., at 26, and *whether or not Gardner-Denver*'s seemingly absolute prohibition of union waiver of employees' federal forum rights *survives Gilmer*, *Gardner-Denver* at least stands for the proposition that the right to a federal judicial forum is of sufficient importance to be protected against less-than-explicit union waiver in a CBA," *id.,* at 80 (emphasis added). *Wright* therefore neither endorsed *Gardner-Denver*'s broad language nor suggested a particular result in this case.

[8] Because today's decision does not contradict the holding of *Gardner-Denver*, we need not resolve the *stare decisis* concerns raised by the dissenting opinions. See *post*, at 4, 9 (opinion of SOUTER, J.); *post*, at 2–4 (opinion of STEVENS, J.). But given the development of this Court's arbitration jurisprudence in the intervening years, see *infra*, at 16–19, *Gardner-Denver* would appear to be a strong candidate for overruling if the dissents' broad view of its holding, see *post*, at 6–7 (opinion of SOUTER, J.), were correct. See *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 173 (1989) (explaining that it is appropriate to overrule a decision where there "has been [an] intervening development of the law" such that the earlier "decision [is] irreconcilable with competing legal doctrines and policies").

2

We recognize that apart from their narrow holdings, the *Gardner-Denver* line of cases included broad dicta that was highly critical of the use of arbitration for the vindication of statutory antidiscrimination rights. That skepticism, however, rested on a misconceived view of arbitration that this Court has since abandoned.

First, the Court in *Gardner-Denver* erroneously assumed that an agreement to submit statutory discrimination claims to arbitration was tantamount to a waiver of those rights. See 415 U. S., at 51. ("[T]here can be no prospective *waiver* of an employee's rights under Title VII" (emphasis added)). For this reason, the Court stated, "the rights conferred [by Title VII] can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII." *Ibid.;* see also *id.*, at 56 ("we have long recognized that 'the choice of forums inevitably affects the scope of the substantive right to be vindicated'" (quoting *U. S. Bulk Carriers, Inc.* v. *Arguelles*, 400 U. S. 351, 359–360 (1971) (Harlan, J., concurring))).

The Court was correct in concluding that federal antidiscrimination rights may not be prospectively waived, see 29 U. S. C. §626(f)(1)(C); see *supra,* at 9, but it confused an agreement to arbitrate those statutory claims with a prospective waiver of the substantive right. The decision to resolve ADEA claims by way of arbitration instead of litigation does not waive the statutory right to be free from workplace age discrimination; it waives only the right to seek relief from a court in the first instance. See *Gilmer*, *supra,* at 26 ("'[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum'" (quoting *Mitsubishi Motors Corp.*, 473 U. S., at 628)). This "Court has been quite specific in holding that arbitration agreements can

be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law." *Circuit City Stores, Inc.*, 532 U. S., at 123. The suggestion in *Gardner-Denver* that the decision to arbitrate statutory discrimination claims was tantamount to a substantive waiver of those rights, therefore, reveals a distorted understanding of the compromise made when an employee agrees to compulsory arbitration.

In this respect, *Gardner-Denver* is a direct descendant of the Court's decision in *Wilko* v. *Swan*, 346 U. S. 427 (1953), which held that an agreement to arbitrate claims under the Securities Act of 1933 was unenforceable. See *id.*, at 438. The Court subsequently overruled *Wilko* and, in so doing, characterized the decision as "pervaded by . . . 'the old judicial hostility to arbitration.'" *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 480 (1989). The Court added: "To the extent that *Wilko* rested on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants, it has fallen far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Id.*, at 481; see also *Mitsubishi Motors Corp.*, *supra,* at 626–627 ("[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution"). The timeworn "mistrust of the arbitral process" harbored by the Court in *Gardner-Denver* thus weighs against reliance on anything more than its core holding. *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 231–232 (1987); see also *Gilmer*, 500 U. S., at 34, n. 5 (reiterating that *Gardner-Denver*'s view of arbitration "has been undermined by [the Court's] recent arbitration decisions"). Indeed, in light of the "radical change, over two decades, in the Court's re-

ceptivity to arbitration," *Wright*, 525 U. S., at 77, reliance on any judicial decision similarly littered with *Wilko*'s overt hostility to the enforcement of arbitration agreements would be ill advised. [9]

Second, *Gardner-Denver* mistakenly suggested that certain features of arbitration made it a forum "well suited to the resolution of contractual disputes," but "a comparatively inappropriate forum for the final resolution of rights created by Title VII." 415 U. S., at 56. According to the

---

[9] JUSTICE STEVENS suggests that the Court is displacing its "earlier determination of the relevant provisions' meaning" based on a "preference for arbitration." *Post*, at 2. But his criticism lacks any basis. We are not revisiting a settled issue or disregarding an earlier determination; the Court is simply deciding the question identified in *Wright* as unresolved. See *supra*, at 5–6; see also *infra*, at 23–24. And, contrary to JUSTICE STEVENS' accusation, it is the Court's fidelity to the ADEA's text—not an alleged preference for arbitration—that dictates the answer to the question presented. As *Gilmer* explained, nothing in the text of Title VII or the ADEA precludes contractual arbitration, see *supra*, at 8–9, and JUSTICE STEVENS has never suggested otherwise. Rather, he has always contended that permitting the "compulsory arbitration" of employment discrimination claims conflicts with his perception of "the congressional purpose animating the ADEA." *Gilmer*, 500 U. S., at 41 (STEVENS, J., dissenting); see also *id.*, at 42 ("Plainly, it would not comport with the congressional objectives behind a statute seeking to enforce civil rights protected by Title VII to allow the very forces that had practiced discrimination to contract away the right to enforce civil rights in the courts" (internal quotation marks omitted)). The *Gilmer* Court did not adopt JUSTICE STEVENS' personal view of the purposes underlying the ADEA, for good reason: That view is not embodied within the statute's text. Accordingly, it is not the statutory text that JUSTICE STEVENS has sought to vindicate—it is instead his own "preference" for mandatory judicial review, which he disguises as a search for congressional purpose. This Court is not empowered to incorporate such a preference into the text of a federal statute. See *infra*, at 20–21. It is for this reason, and not because of a "policy favoring arbitration," see *post*, at 1, 3 (STEVENS, J., dissenting), that the Court overturned *Wilko* v. *Swan*, 346 U. S. 427 (1953). And it is why we disavow the antiarbitration dicta of *Gardner-Denver* and its progeny today.

Court, the "factfinding process in arbitration" is "not equivalent to judicial factfinding" and the "informality of arbitral procedure . . . makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts." *Id.*, at 57, 58. The Court also questioned the competence of arbitrators to decide federal statutory claims. See *id.*, at 57 ("[T]he specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land"); *Barrentine*, 450 U. S., at 743 ("Although an arbitrator may be competent to resolve many preliminary factual questions, such as whether the employee 'punched in' when he said he did, he may lack competence to decide the ultimate legal issue whether an employee's right to a minimum wage or to overtime pay under the statute has been violated"). In the Court's view, "the resolution of statutory or constitutional issues is a primary responsibility of courts, and judicial construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts." *Gardner-Denver*, *supra,* at 57; see also *McDonald*, 466 U. S., at 290 ("An arbitrator may not . . . have the expertise required to resolve the complex legal questions that arise in §1983 actions").

These misconceptions have been corrected. For example, the Court has "recognized that arbitral tribunals are readily capable of handling the factual and legal complexities of antitrust claims, notwithstanding the absence of judicial instruction and supervision" and that "there is no reason to assume at the outset that arbitrators will not follow the law." *McMahon*, *supra,* at 232; *Mitsubishi Motors Corp.*, 473 U. S., at 634 ("We decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators"). An arbitrator's capacity to resolve complex questions of fact and

law extends with equal force to discrimination claims brought under the ADEA.  Moreover, the recognition that arbitration procedures are more streamlined than federal litigation is not a basis for finding the forum somehow inadequate; the relative informality of arbitration is one of the chief reasons that parties select arbitration.  Parties "trad[e] the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration."  *Id.*, at 628.  In any event, "[i]t is unlikely . . . that age discrimination claims require more extensive discovery than other claims that we have found to be arbitrable, such as RICO and antitrust claims."  *Gilmer*, 500 U. S., at 31.  At bottom, objections centered on the nature of arbitration do not offer a credible basis for discrediting the choice of that forum to resolve statutory antidiscrimination claims.[10]

Third, the Court in *Gardner-Denver* raised in a footnote a "further concern" regarding "the union's exclusive control over the manner and extent to which an individual grievance is presented."  415 U. S., at 58, n. 19.  The Court suggested that in arbitration, as in the collective-bargaining process, a union may subordinate the interests of an individual employee to the collective interests of all employees in the bargaining unit.  *Ibid.;* see also *McDonald*, *supra*, at 291 ("The union's interests and those of the individual employee are not always identical or even compatible.  As a result, the union may present the employee's grievance less vigorously, or make different stra-

_____

[10] Moreover, an arbitrator's decision as to whether a unionized employee has been discriminated against on the basis of age in violation of the ADEA remains subject to judicial review under the FAA.  9 U. S. C. §10(a).  "[A]lthough judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute."  *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 232 (1987).

tegic choices, than would the employee"); see also *Barrentine*, *supra,* at 742; *post*, at 8, n. 4 (SOUTER, J., dissenting).

We cannot rely on this judicial policy concern as a source of authority for introducing a qualification into the ADEA that is not found in its text. Absent a constitutional barrier, "it is not for us to substitute our view of . . . policy for the legislation which has been passed by Congress." *Florida Dept. of Revenue* v. *Piccadilly Cafeterias, Inc.*, 554 U. S. \_\_\_, \_\_\_ (2008) (slip op., at 18) (internal quotation marks omitted). Congress is fully equipped "to identify any category of claims as to which agreements to arbitrate will be held unenforceable." *Mitsubishi Motors Corp.*, *supra*, at 627. Until Congress amends the ADEA to meet the conflict-of-interest concern identified in the *Gardner-Denver* dicta, and seized on by respondents here, there is "no reason to color the lens through which the arbitration clause is read" simply because of an alleged conflict of interest between a union and its members. *Mitsubishi Motors Corp., supra,* at 628. This is a "battl[e] that should be fought among the political branches and the industry. Those parties should not seek to amend the statute by appeal to the Judicial Branch." *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 462 (2002).

The conflict-of-interest argument also proves too much. Labor unions certainly balance the economic interests of some employees against the needs of the larger work force as they negotiate collective-bargain agreements and implement them on a daily basis. But this attribute of organized labor does not justify singling out an arbitration provision for disfavored treatment. This "principle of majority rule" to which respondents object is in fact the central premise of the NLRA. *Emporium Capwell Co.* v. *Western Addition Community Organization*, 420 U. S. 50, 62 (1975). "In establishing a regime of majority rule, Congress sought to secure to all members of the unit the benefits of their collective strength and bargaining power,

in full awareness that the superior strength of some individuals or groups might be subordinated to the interest of the majority." *Ibid.* (footnote omitted); see also *Ford Motor Co.* v. *Huffman*, 345 U. S. 330, 338 (1953) ("The complete satisfaction of all who are represented is hardly to be expected"); *Pennsylvania R. Co.* v. *Rychlik*, 352 U. S. 480, 498 (1957) (Frankfurter, J., concurring). It was Congress' verdict that the benefits of organized labor outweigh the sacrifice of individual liberty that this system necessarily demands. Respondents' argument that they were deprived of the right to pursue their ADEA claims in federal court by a labor union with a conflict of interest is therefore unsustainable; it amounts to a collateral attack on the NLRA.

In any event, Congress has accounted for this conflict of interest in several ways. As indicated above, the NLRA has been interpreted to impose a "duty of fair representation" on labor unions, which a union breaches "when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Marquez* v. *Screen Actors*, 525 U. S. 33, 44 (1998). This duty extends to "challenges leveled not only at a union's contract administration and enforcement efforts but at its negotiation activities as well." *Beck*, 487 U. S., at 743 (citation omitted). Thus, a union is subject to liability under the NLRA if it illegally discriminates against older workers in either the formation or governance of the collective-bargaining agreement, such as by deciding not to pursue a grievance on behalf of one of its members for discriminatory reasons. See *Vaca* v. *Sipes*, 386 U. S. 171, 177 (1967) (describing the duty of fair representation as the "statutory obligation to serve the interests of *all* members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct" (emphasis added)). Respondents in fact brought a fair representation suit against the Union based on its

withdrawal of support for their age-discrimination claims. See n. 2, *supra.* Given this avenue that Congress has made available to redress a union's violation of its duty to its members, it is particularly inappropriate to ask this Court to impose an artificial limitation on the collective-bargaining process.

In addition, a union is subject to liability under the ADEA if the union itself discriminates against its members on the basis of age. See 29 U. S. C. §623(d); see also 1 B. Lindemann & P. Grossman, Employment Discrimination Law 1575–1581 (4th ed. 2007) (explaining that a labor union may be held jointly liable with an employer under federal antidiscrimination laws for discriminating in the formation of a collective-bargaining agreement, knowingly acquiescing in the employer's discrimination, or inducing the employer to discriminate); cf. *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656, 669 (1987). Union members may also file age-discrimination claims with the EEOC and the National Labor Relations Board, which may then seek judicial intervention under this Court's precedent. See *EEOC* v. *Waffle House, Inc.*, 534 U. S. 279, 295–296 (2002). In sum, Congress has provided remedies for the situation where a labor union is less than vigorous in defense of its members' claims of discrimination under the ADEA.

## III

Finally, respondents offer a series of arguments contending that the particular CBA at issue here does not clearly and unmistakably require them to arbitrate their ADEA claims. See Brief for Respondents 44–47. But respondents did not raise these contract-based arguments in the District Court or the Court of Appeals. To the contrary, respondents acknowledged on appeal that the CBA provision requiring arbitration of their federal antidiscrimination statutory claims "is sufficiently explicit" in

precluding their federal lawsuit. Brief for Plaintiffs-Appellees in No. 06–3047–cv(L) etc. (CA2), p. 9. In light of respondents' litigating position, both lower courts assumed that the CBA's arbitration clause clearly applied to respondents and proceeded to decide the question left unresolved in *Wright*. We granted review of the question presented on that understanding.

"Without cross-petitioning for certiorari, a prevailing party may, of course, 'defend its judgment on any ground properly raised below whether or not that ground was relied upon, rejected, or even considered by the District Court or the Court of Appeals.'" *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 38–39 (1989) (quoting *Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 476, n. 20 (1979)). But this Court will affirm on grounds that have "'not been raised below . . . "only in exceptional cases."'" *Nordberg, supra,* at 39 (quoting *Heckler* v. *Campbell*, 461 U. S. 458, 468–469, n. 12 (1983)). This is not an "exceptional case." As a result, we find that respondents' alternative arguments for affirmance have been forfeited. See, *e.g.*, *Rita* v. *United States*, 551 U. S. 338, 360 (2007); *Sprietsma* v. *Mercury Marine*, 537 U. S. 51, 56, n. 4 (2002). We will not resurrect them on respondents' behalf.

Respondents also argue that the CBA operates as a substantive waiver of their ADEA rights because it not only precludes a federal lawsuit, but also allows the Union to block arbitration of these claims. Brief for Respondents 28–30. Petitioners contest this characterization of the CBA, see Reply Brief for Petitioners 23–27, and offer record evidence suggesting that the Union has allowed respondents to continue with the arbitration even though the Union has declined to participate, see App. to Pet. for Cert. 42a. But not only does this question require resolution of contested factual allegations, it was not fully briefed to this or any court and is not fairly encompassed

within the question presented, see this Court's Rule 14.1(a). Thus, although a substantive waiver of federally protected civil rights will not be upheld, see *Mitsubishi Motors Corp.*, 473 U. S., at 637, and n. 19; *Gilmer*, 500 U. S., at 29, we are not positioned to resolve in the first instance whether the CBA allows the Union to prevent respondents from "effectively vindicating" their "federal statutory rights in the arbitral forum," *Green Tree Financial Corp.-Ala.* v. *Randolph*, 531 U. S. 79, 90 (2000). Resolution of this question at this juncture would be particularly inappropriate in light of our hesitation to invalidate arbitration agreements on the basis of speculation. See *id.,* at 91.

## IV

We hold that a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate ADEA claims is enforceable as a matter of federal law. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

——————

No. 07–581

——————

## 14 PENN PLAZA LLC, ET AL., PETITIONERS *v.* STEVEN PYETT ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 1, 2009]

JUSTICE STEVENS, dissenting.

JUSTICE SOUTER's dissenting opinion, which I join in full, explains why our decision in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974), answers the question presented in this case. My concern regarding the Court's subversion of precedent to the policy favoring arbitration prompts these additional remarks.

Notwithstanding the absence of change in any relevant statutory provision, the Court has recently retreated from, and in some cases reversed, prior decisions based on its changed view of the merits of arbitration. Previously, the Court approached with caution questions involving a union's waiver of an employee's right to raise statutory claims in a federal judicial forum. After searching the text and purposes of Title VII of the Civil Rights Act of 1964, the Court in *Gardner-Denver* held that a clause of a collective-bargaining agreement (CBA) requiring arbitration of discrimination claims could not waive an employee's right to a judicial forum for statutory claims. See 415 U. S., at 51. The Court's decision rested on several features of the statute, including the individual nature of the rights it confers, the broad remedial powers it grants federal courts, and its expressed preference for overlapping remedies. See *id.*, at 44–48. The Court also noted the problem of entrusting a union with certain arbitration decisions

given the potential conflict between the collective interest and the interests of an individual employee seeking to assert his rights. See *id.*, at 58, n. 19. That concern later provided a basis for our decisions in *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728, 742 (1981), and *McDonald* v. *West Branch*, 466 U. S. 284, 291 (1984), which similarly held that a CBA may not commit enforcement of certain rights-creating statutes exclusively to a union-controlled arbitration process. Congress has taken no action signaling disagreement with those decisions.

The statutes construed by the Court in the foregoing cases and in *Wilko* v. *Swan*, 346 U. S. 427 (1953), have not since been amended in any relevant respect. But the Court has in a number of cases replaced our predecessors' statutory analysis with judicial reasoning espousing a policy favoring arbitration and thereby reached divergent results. I dissented in those cases to express concern that my colleagues were making policy choices not made by Congress. See *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 640 (1985); *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 486 (1989); *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20, 36 (1991); and *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 124 (2001).

Today the majority's preference for arbitration again leads it to disregard our precedent. Although it purports to ascertain the relationship between the Age Discrimination in Employment Act of 1967 (ADEA), the National Labor Relations Act, and the Federal Arbitration Act, the Court ignores our earlier determination of the relevant provisions' meaning. The Court concludes that "[i]t was Congress' verdict that the benefits of organized labor outweigh the sacrifice of individual liberty" that the system of organized labor "necessarily demands," even when the sacrifice demanded is a judicial forum for asserting an individual statutory right. *Ante*, at 22. But in *Gard-*

*ner-Denver* we determined that "Congress' verdict" was otherwise when we held that Title VII does not permit a CBA to waive an employee's right to a federal judicial forum. Because the purposes and relevant provisions of Title VII and the ADEA are not meaningfully distinguishable, it is only by reexamining the statutory questions resolved in *Gardner-Denver* through the lens of the policy favoring arbitration that the majority now reaches a different result.*

Under the circumstances, I believe a passage from one of my earlier dissents merits repetition. The Court in *Rodriguez de Quijas* overruled our decision in *Wilko* and held that predispute agreements to arbitrate claims under the Securities Act of 1933 are enforceable. 490 U. S., at 484; see also *id.*, at 481 (noting *Wilko*'s reliance on "the outmoded presumption of disfavoring arbitration proceedings"). I observed in dissent:

> "In the final analysis, a Justice's vote in a case like this depends more on his or her views about the respective lawmaking responsibilities of Congress and this Court than on conflicting policy interests. Judges who have confidence in their own ability to fashion public policy are less hesitant to change the law than those of us who are inclined to give wide latitude to the views of the voters' representatives on nonconsti-

---

*Referring to the potential conflict between individual and collective interests, the Court asserts that it "cannot rely on this judicial policy concern as a source of authority for introducing a qualification into the ADEA that is not found in its text." *Ante*, at 21. That potential conflict of interests, however, was a basis for our decision in several pertinent cases, including *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974), and *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20, 35 (1991), and in the intervening years Congress has not seen fit to correct that interpretation. The Court's derision of that "policy concern" is particularly disingenuous given its subversion of *Gardner-Denver*'s holding in the service of an extratextual policy favoring arbitration.

tutional matters.   Cf. *Boyle* v. *United Technologies Corp.*, 487 U. S. 500 (1988).   As I pointed out years ago, *Alberto-Culver Co.* v. *Scherk*, 484 F. 2d 611 (CA7 1973) (dissenting opinion), rev'd, 417 U. S. 506 (1974), there are valid policy and textual arguments on both sides regarding the interrelation of federal securities and arbitration Acts.   None of these arguments, however, carries sufficient weight to tip the balance between judicial and legislative authority and overturn an interpretation of an Act of Congress that has been settled for many years."   *Rodriguez de Quijas*, 490 U. S., at 487 (footnote and citation omitted).

As was true in *Rodriguez de Quijas*, there are competing arguments in this case regarding the interaction of the relevant statutory provisions.   But the Court in *Gardner-Denver* considered these arguments, including "the federal policy favoring arbitration of labor disputes," 415 U. S., at 59, and held that Congress did not intend to permit the result petitioners seek.   In the absence of an intervening amendment to the relevant statutory language, we are bound by that decision.   It is for Congress, rather than this Court, to reassess the policy arguments favoring arbitration and revise the relevant provisions to reflect its views.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–581

———————

## 14 PENN PLAZA LLC, ET AL., PETITIONERS *v.* STEVEN PYETT ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[April 1, 2009]

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The issue here is whether employees subject to a collective-bargaining agreement (CBA) providing for conclusive arbitration of all grievances, including claimed breaches of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U. S. C. §621 *et seq.*, lose their statutory right to bring an ADEA claim in court, §626(c). Under the 35-year-old holding in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974), they do not, and I would adhere to *stare decisis* and so hold today.

## I

Like Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e *et seq.*, the ADEA is aimed at "'the elimination of discrimination in the workplace,'" *McKennon* v. *Nashville Banner Publishing Co.*, 513 U. S. 352, 358 (1995) (quoting *Oscar Mayer & Co.* v. *Evans*, 441 U. S. 750, 756 (1979)), and, again like Title VII, the ADEA "contains a vital element . . . : It grants an injured employee a right of action to obtain the authorized relief," 513 U. S., at 358. "Any person aggrieved" under the Act "may bring a civil action in any court of competent jurisdiction for legal or equitable relief," 29 U. S. C. §626(c), thereby "not only redress[ing] his own injury but also vindicat[ing] the important con-

gressional policy against discriminatory employment practices," *Gardner-Denver*, *supra*, at 45.

*Gardner-Denver* considered the effect of a CBA's arbitration clause on an employee's right to sue under Title VII. One of the employer's arguments was that the CBA entered into by the union had waived individual employees' statutory cause of action subject to a judicial remedy for discrimination in violation of Title VII. Although Title VII, like the ADEA, "does not speak expressly to the relationship between federal courts and the grievance-arbitration machinery of collective-bargaining agreements," 415 U. S., at 47, we unanimously held that "the rights conferred" by Title VII (with no exception for the right to a judicial forum) cannot be waived as "part of the collective bargaining process," *id.*, at 51. We stressed the contrast between two categories of rights in labor and employment law. There were "statutory rights related to collective activity," which "are conferred on employees collectively to foster the processes of bargaining[, which] properly may be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members." *Ibid.* But "Title VII . . . stands on plainly different [categorical] ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities." *Ibid.* Thus, as the Court previously realized, *Gardner-Denver* imposed a "seemingly absolute prohibition of union waiver of employees' federal forum rights." *Wright* v. *Universal Maritime Service Corp.*, 525 U. S. 70, 80 (1998).[1]

We supported the judgment with several other lines of complementary reasoning. First, we explained that anti-

---

[1] *Gardner-Denver* also contained some language seemingly prohibiting even individual prospective waiver of federal forum rights, see 415 U. S., at 51–52, an issue revisited in *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20 (1991), and not disputed here.

discrimination statutes "have long evinced a general intent to accord parallel or overlapping remedies against discrimination," and Title VII's statutory scheme carried "no suggestion . . . that a prior arbitral decision either forecloses an individual's right to sue or divests federal courts of jurisdiction." *Gardner-Denver*, 415 U. S., at 47. We accordingly concluded that "an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." *Id.*, at 49.

Second, we rejected the District Court's view that simply participating in the arbitration amounted to electing the arbitration remedy and waiving the plaintiff's right to sue. We said that the arbitration agreement at issue covered only a contractual right under the CBA to be free from discrimination, not the "independent statutory rights accorded by Congress" in Title VII. *Id.*, at 49–50. Third, we rebuffed the employer's argument that federal courts should defer to arbitral rulings. We declined to make the "assumption that arbitral processes are commensurate with judicial processes," *id.*, at 56, and described arbitration as "a less appropriate forum for final resolution of Title VII issues than the federal courts," *id.*, at 58.

Finally, we took note that "[i]n arbitration, as in the collective bargaining process, the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit," *ibid.,* n. 19, a result we deemed unacceptable when it came to Title VII claims. In sum, *Gardner-Denver* held that an individual's statutory right of freedom from discrimination and access to court for enforcement were beyond a union's power to waive.

Our analysis of Title VII in *Gardner-Denver* is just as pertinent to the ADEA in this case. The "interpretation of Title VII . . . applies with equal force in the context of age discrimination, for the substantive provisions of the ADEA

'were derived *in haec verba* from Title VII,'" and indeed neither petitioners nor the Court points to any relevant distinction between the two statutes. *Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 121 (1985) (quoting *Lorillard* v. *Pons*, 434 U. S. 575, 584 (1978)); see also *McKennon*, 513 U. S., at 358 ("The ADEA and Title VII share common substantive features and also a common purpose"). Given the unquestionable applicability of the *Gardner-Denver* rule to this ADEA issue, the argument that its precedent be followed in this case of statutory interpretation is equally unquestionable. "Principles of *stare decisis* . . . demand respect for precedent whether judicial methods of interpretation change or stay the same. Were that not so, those principles would fail to achieve the legal stability that they seek and upon which the rule of law depends." *CBOCS West, Inc.* v. *Humphries*, 553 U. S. ___, ___ (2008) (slip op., at 14). And "[c]onsiderations of *stare decisis* have special force" over an issue of statutory interpretation, which is unlike constitutional interpretation owing to the capacity of Congress to alter any reading we adopt simply by amending the statute. *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989). Once we have construed a statute, stability is the rule, and "we will not depart from [it] without some compelling justification." *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 202 (1991). There is no argument for abandoning precedent here, and *Gardner-Denver* controls.

## II

The majority evades the precedent of *Gardner-Denver* as long as it can simply by ignoring it. The Court never mentions the case before concluding that the ADEA and the National Labor Relations Act, 29 U. S. C. §151 *et seq.*, "yiel[d] a straightforward answer to the question presented," *ante*, at 10, that is, that unions can bargain away

individual rights to a federal forum for antidiscrimination claims. If this were a case of first impression, it would at least be possible to consider that conclusion, but the issue is settled and the time is too late by 35 years to make the bald assertion that "[n]othing in the law suggests a distinction between the status of arbitration agreements signed by an individual employee and those agreed to by a union representative." *Ante*, at 9. In fact, we recently and unanimously said that the principle that "federal forum rights cannot be waived in union-negotiated CBAs even if they can be waived in individually executed contracts . . . assuredly finds support in" our case law, *Wright*, 525 U. S., at 77, and every Court of Appeals save one has read our decisions as holding to this position, *Air Line Pilots Assn., Int'l* v. *Northwest Airlines, Inc.*, 199 F. 3d 477, 484 (CADC 1999) ("We see a clear rule of law emerging from *Gardner-Denver* and *Gilmer* [v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20 (1991)]: . . . an individual may prospectively waive his own statutory right to a judicial forum, but his union may not prospectively waive that right for him. All of the circuits to have considered the meaning of *Gardner-Denver* after *Gilmer,* other than the Fourth, are in accord with this view").

Equally at odds with existing law is the majority's statement that "[t]he decision to fashion a CBA to require arbitration of employment-discrimination claims is no different from the many other decisions made by parties in designing grievance machinery." *Ante*, at 7. That is simply impossible to square with our conclusion in *Gardner-Denver* that "Title VII . . . stands on plainly different ground" from "statutory rights related to collective activity": "it concerns not majoritarian processes, but an individual's right to equal employment opportunities." 415 U. S., at 51; see also *Atchison, T. & S. F. R. Co.* v. *Buell*, 480 U. S. 557, 565 (1987) ("[N]otwithstanding the strong policies encouraging arbitration, 'different considerations

apply where the employee's claim is based on rights aris-ing out of a statute designed to provide minimum substan-tive guarantees to individual workers'" (quoting *Barren-tine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728, 737 (1981))).

When the majority does speak to *Gardner-Denver*, it misreads the case in claiming that it turned solely "on the narrow ground that the arbitration was not preclusive because the collective-bargaining agreement did not cover statutory claims." *Ante*, at 12. That, however, was merely one of several reasons given in support of the decision, see *Gardner-Denver*, 415 U. S., at 47–59, and we raised it to explain why the District Court made a mistake in thinking that the employee lost his Title VII rights by electing to pursue the contractual arbitration remedy, see *id.*, at 49–50. One need only read *Gardner-Denver* itself to know that it was not at all so narrowly reasoned, and we have noted already how later cases have made this abundantly clear. *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S., at 737, provides further testimony:

> "Not all disputes between an employee and his em-ployer are suited for binding resolution in accordance with the procedures established by collective bargain-ing. While courts should defer to an arbitral decision where the employee's claim is based on rights arising out of a collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individ-ual workers.
>
>     "These considerations were the basis for our deci-sion in *[Gardner-Denver]*."

See also *Gilmer*, *supra*, at 35 ("An important concern" in *Gardner-Denver* "was the tension between collective rep-resentation and individual statutory rights . . ."). Indeed,

if the Court can read *Gardner-Denver* as resting on noth-
ing more than a contractual failure to reach as far as
statutory claims, it must think the Court has been wreak-
ing havoc on the truth for years, since (as noted) we have
unanimously described the case as raising a "seemingly
absolute prohibition of union waiver of employees' federal
forum rights." *Wright*, *supra*, at 80.[2]  Human ingenuity is
not equal to the task of reconciling statements like this
with the majority's representation that *Gardner-Denver*
held only that "the arbitration was not preclusive because
the collective-bargaining agreement did not cover statu-
tory claims." *Ante*, at 12.[3]

Nor, finally, does the majority have any better chance of
being rid of another of *Gardner-Denver*'s statements sup-
porting its rule of decision, set out and repeated in previ-
ous quotations: "in arbitration, as in the collective-

────────────

[2]The majority seems inexplicably to think that the statutory right to
a federal forum is not a right, or that *Gardner-Denver* failed to recog-
nize it because it is not "substantive." *Ante*, at 7, n. 5.  But *Gardner-
Denver* forbade union waiver of employees' federal forum rights in large
part because of the importance of such rights and a fear that unions
would too easily give them up to benefit the many at the expense of the
few, a far less salient concern when only economic interests are at
stake.  See, *e.g.*, *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450
U. S. 728, 737 (1981).

[3]There is no comfort for the Court in making the one point on which
we are in accord, that *Gardner-Denver* relied in part on what the
majority describes as "broad dicta that was highly critical of the use of
arbitration for the vindication of statutory antidiscrimination rights."
*Ante*, at 15–16.  I agree that *Gardner-Denver*'s "'mistrust of the arbitral
process' . . . has been undermined by our recent arbitration decisions,"
*Gilmer*, *supra*, at 34, n. 5 (quoting *Shearson/American Express Inc.* v.
*McMahon*, 482 U. S. 220, 231 (1987)), but if the statements are "dicta,"
their obsolescence is as irrelevant to *Gardner-Denver*'s continued
vitality as their currency was to the case's holding when it came down;
in *Gardner-Denver* itself we acknowledged "the federal policy favoring
arbitration," 415 U. S., at 46, n. 6, but nonetheless held that a union
could not waive its members' statutory right to a federal forum in a
CBA.

bargaining process, a union may subordinate the interests of an individual employee to the collective interests of all employees in the bargaining unit," *ante*, at 20 (citing 415 U. S*.,* at 58, n. 19), an unacceptable result when it comes to "an individual's right to equal employment opportunities," *id.*, at 51. The majority tries to diminish this reasoning, and the previously stated holding it supported, by making the remarkable rejoinder that "[w]e cannot rely on this judicial policy concern as a source of authority for introducing a qualification into the ADEA that is not found in its text." *Ante,* at 20.[4] It is enough to recall that respondents are not seeking to "introduc[e] a qualification into" the law; they are justifiably relying on statutory-interpretation precedent decades old, never overruled, and serially reaffirmed over the years. See, *e.g.*, *McDonald* v. *West Branch*, 466 U. S. 284, 291 (1984); *Barrentine*, *supra*, at 742. With that precedent on the books, it makes no sense for the majority to claim that "judicial policy con-

_____

[4] The majority says it would be "particularly inappropriate" to consider *Gardner-Denver*'s conflict-of-interest rationale because "Congress has made available" another "avenue" to protect workers against union discrimination, namely, a duty of fair representation claim. *Ante*, at 22. This answer misunderstands the law, for unions may decline for a variety of reasons to pursue potentially meritorious discrimination claims without succumbing to a member's suit for failure of fair representation. See, *e.g.*, *Barrentine*, 450 U. S., at 742 ("[E]ven if the employee's claim were meritorious, his union might, without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigorously in arbitration"). More importantly, we have rejected precisely this argument in the past, making this yet another occasion where the majority ignores precedent. See, *e.g.*, *ibid.*; *Gardner-Denver*, *supra*, at 58, n. 19 (noting that a duty of fair representation claim would often "prove difficult to establish"). And we were wise to reject it. When the Court construes statutes to allow a union to eliminate a statutory right to sue in favor of arbitration in which the union cannot represent the employee because it agreed to the employer's challenged action, it is not very consoling to add that the employee can sue the union for being unfair.

cern[s]" about unions sacrificing individual antidiscrimination rights should be left to Congress.

For that matter, Congress has unsurprisingly understood *Gardner-Denver* the way we have repeatedly explained it and has operated on the assumption that a CBA cannot waive employees' rights to a judicial forum to enforce antidiscrimination statutes. See, *e.g.*, H. R. Rep. No. 102–40, pt. 1, p. 97 (1991) (stating that, "consistent with the Supreme Court's interpretation of Title VII in *[Gardner-Denver]*," "any agreement to submit disputed issues to arbitration . . . in the context of a collective bargaining agreement . . . does not preclude the affected person from seeking relief under the enforcement provisions of Title VII"). And Congress apparently does not share the Court's demotion of *Gardner-Denver*'s holding to a suspect judicial policy concern: "Congress has had [over] 30 years in which it could have corrected our decision . . . if it disagreed with it, and has chosen not to do so. We should accord weight to this continued acceptance of our earlier holding." *Hilton*, 502 U. S., at 202; see also *Patterson*, 491 U. S.*,* at 172–173.

### III

On one level, the majority opinion may have little effect, for it explicitly reserves the question whether a CBA's waiver of a judicial forum is enforceable when the union controls access to and presentation of employees' claims in arbitration, *ante*, at 24–25, which "is usually the case," *McDonald*, *supra*, at 291. But as a treatment of precedent in statutory interpretation, the majority's opinion cannot be reconciled with the *Gardner-Denver* Court's own view of its holding, repeated over the years and generally understood, and I respectfully dissent.